**NEW ORLEANS TERMINAL COMPANY and Southern Pacific Company, Appellants,**

v.

**Charles W. SPENCER et al., Appellees.**

**No. 23241.**

United States Court of Appeals Fifth Circuit.

Sept. 15, 1966.

Rehearing Denied Oct. 11, 1966.

Benjamin R. Slater, Jr., Malcolm L. Monroe, Walter J. Suthon, III, New Orleans, La., for plaintiff-appellant, New Orleans Terminal Co., W. Graham Claytor, Jr., Arnold B. McKinnon, Covington & Burling, William H. Allen, Washington, D. C., Monroe & Lemann, New Orleans, La., of counsel.

Harry McCall, Jr., New Orleans, La., for Southern Pacific Co.

Nathan Greenberg, Gretna, La., Louis G. DeSonier, Jr., Ferdinand M. Lob, Metairie, La., Waverly A. Henning, Asst. Dist. Atty., Parish of Jefferson, for appellees.

Before JONES and BELL, Circuit Judges, and BREWSTER, District Judge.

JONES, Circuit Judge:

The New Orleans Terminal Company is one of a number of railway companies which form the Southern Railway System. It operates a short rail line for moving and interchanging freight shipments between the railroads coming into New Orleans from the east and northeast and those from the west and northwest. It is the conduit for the flow of freight traffic through New Orleans from East to West and West to East, providing a connection not only between other components of the Southern Railway System but also serving the other lines in and out of New Orleans. It extends from within St. Bernard Parish on the East, through Orleans Parish and into Jefferson Parish on the West, all in the metropolitan area of the city of New Orleans.

In 1895 Jefferson Parish gave the New Orleans and Western Railroad, a predecessor of New Orleans Terminal, permission to cross streets or roads, including Labarre Road and Shrewsbury Road. In 1942 the Police Jury of the Parish enacted Ordinance No. 812 by which it gave New Orleans Terminal Company permission for the construction of one additional rail crossing over Labarre Road and four additional crossings over Shrewsbury Road.[1] The ordinance recited that New Orleans Terminal Company was a common carrier serving the public "and also engaged in the handling of large quantities of National Defense

material" and desired the permit "in order to move the National Defense materials and its other freight and business expeditiously." Permits were also secured from the Louisiana Highway Department. In December, 1958, the Jefferson Parish Counci' ᴀnacted Ordinance No. 3911. It recited th at Ordinance No. 812 was for the specific purpose of expediting the handling of National Defense materials during World War II, and the purpose of Ordinance No. 812 was no longer existent since the cessation of hostilities of World War II. The Ordinance recited grievances[2] against New Orleans Terminal Company. Ordinance No. 3911 purported to repeal Ordinance No. 812, became effective February 1, 1959, and gave New Orleans Terminal Company thirty days to remove the tracks which had been constructed under Ordinance No. 812. The Ordinance directed the Parish President and Parish Attorney to take action, by suit or otherwise to compel the removal of the crossings. The Sheriff was authorized to enforce the terms of the Ordinance. In March, 1959, the Parish Council passed Ordinance No. 3967 which provided penalties for the violation of Ordinance No. 3911. Several train crews were arrested for operating trains over the crossings.

The New Orleans Terminal Company brought suit in the District Court for the Eastern District of Louisiana against the President, the Chairman, and the members of the Jefferson Parish

---

1. The ordinance permitted an additional crossing over Airline Highway, which is not involved in this controversy.

2. "WHEREAS, by the leasing of wheeling rights and the granting of contracts to other railroads, which traverse a strictly zoned residential community with rapidly increasing population, the New Orleans Terminal Company has:

"(a) Allowed these tracks to become a marshalling yard with a complete lack of consideration for property owners adjacent to the tracks. The making up of trains by the various lines operating on this back belt track is a 24-hour operation, and the humping and bumping causes

property damage and mental anguish to the residents;

"(b) Created a disturbance of the peace and public nuisance by humping and bumping, blasting loud horns and whistles, parking mechanized refrigerated cars, and cars full of live cattle at all hours of the day and night;

"(c) Endangered life and property by the switching and parking of tank cars containing highly explosive, inflammable and/or combustible materials;

"(d) By blocking the crossings the railroads using the tracks (1) decrease fire-protection available to all Metairie residents and (2) in case of a local emergency could cause a complete breakdown in civil defense evacuation plans for this area."

Council, the Parish Attorney, the District Attorney and the Sheriff.[3] The Texas and New Orleans Railroad Company[4] had been given some operating rights over parts of the trackage and was permitted to intervene as a plaintiff. The defendants answered and counterclaimed, praying for a declaratory judgment that the 1958 Ordinance was valid.

The track constructed by the railroad under the 1895 ordinance is about sixteen miles in length. The railroad refers to it as its first main track and it is identified in the litigation as Track A. The right of the railroad to continue its use is not questioned. There are two tracks which the Parish seeks to have removed. One of these, referred to by the railroad as its second main line, or as a part of its second main line, is designated as Track B. It crosses Shrewsbury Road and Labarre Road. It is about 12,000 feet in length and connects at both ends with Track A. The other track which the Parish would have removed is referred to as the Illinois Central Interchange Track and, for the purpose of the suit, is called Track C. It is about 1900 feet in length and connects with Track B at its east end and with Tracks A and B at its west end. It crosses Shrewsbury Road. The relative locations of rail lines and streets are indicated on the sketch in the margin.[5]

Track A, generally speaking, carries the East to West movements, and Track B carries most of the West to East movements. On the average, about 261 cars moving interstate would be handled each day over Track B. As found by the district court, interstate traffic clearly constitutes a substantial portion of the business carried over Track B. The use of Track C was similar to that of Track B. Its use was generally confined to movements from and to the Illinois Central Railroad Company and of cuts of cars shorter than could be handled on Track B. The district court noted that the Congress could have undertaken to regulate Track B[6] under the Commerce Clause of the Constitution. The district court observed that if the recently enacted ordinances were valid, their effect would be to require an abandonment by the railroad of Track B and Track C.

■■ The district court properly concluded that its initial question was one of jurisdiction. If the tracks could not be abandoned without the approval of the Interstate Commerce Commission, the ordinances would be unenforceable unless that approval was obtained.

---

3. Successors in office of the defendants were substituted as parties while the suit was pending in the district court.

4. This corporation, by a merger, was succeeded during the pendency of the cause, by Southern Pacific Company.

5.

Shrewsbury Road   Labarre Road   Metairie Road

6. And also, it would seem, Track C.

Whether such approval is required depends upon the construction and application of Section 1(18) [7] and Section 1 (22) [8] of the Interstate Commerce Act.[9] If Tracks B and C are parts of the line of railroad, or extensions thereof, they cannot be abandoned nor can the abandonment be required by the action of a state or state subdivision without the issuance of a certificate by the Commission. On the other hand, if Tracks B and C are spur, industrial, team, switching or side tracks, they are subject to valid state regulation, and Jefferson Parish, a subdivision and agency of the State of Louisiana may require the railroad to abandon the tracks by ordinances such as it has enacted.

■ Whether a particular stretch of rail is a line of railroad, or is an extended line of railroad or is a spur, industrial, team, switching or side track, is a mixed question of law and fact to be determined judicially rather than administratively. United States v. Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070.

The case most nearly analogous to that before us had its beginnings in a proceeding initiated before the Interstate Commerce Commission by one railroad company [10] against two other railroads,[11] with a fourth rail line [12] intervening, seeking to require the Milwaukee and the Ishpeming to cease operating tracks which had been constructed and were being used without a certificate having been procured from the Interstate Commerce Commission, and which served as connecting and interchange tracks between the main lines of the two carriers at Republic Junction in the Upper Peninsula of Michigan. The connecting trackage was used for the placement and storage of cars while in course of de-delivery from one of the railroads to the other. The Milwaukee and the Ishpeming contended that the tracks were switching tracks and as such were exempt from Commission jurisdiction by reason of Section 1(22). The Commission, relying upon and quoting from the landmark case of Texas & Pacific Ry. Co. v. Gulf, Colorado & Santa Fe Ry. Co., 270 U.S. 266, 277–278, 46 S.Ct. 263, 70 L.Ed. 578, held that the tracks in question were not mere switching tracks, utilized for loading, reloading, storage and switching the cars and for other things merely incidental to the regular

7. No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter, without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks. 49 U.S.C.A. § 1(18).

8. The authority of the Commission conferred by paragraphs (18) to (21) of this section, both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation. 49 U.S.C.A. § 1(22).

9. The intervening subsections, (19) and (20), of Section 1 of the Act are not here relevant.

10. Duluth, South Shore & Atlantic Railroad Company.

11. Chicago, Milwaukee, St. Paul & Pacific Railroad Company and Lake Superior & Ishpeming Railroad Company.

12. Chicago and Northwestern Railway Company.

train haul, but were, in fact, extensions of the lines of the two carriers and within the provisions of Section 1(18) of the Act. Duluth, South Shore & Atlantic Railroad Company v. Chicago, Milwaukee, St. Paul & Pacific Railroad Company, 307 I.C.C. 311. In its opinion the Commission said:

"While the physical movement of the cars from the line of one carrier to the other is, as contended by defendants, a switching movement, the act of placing or removing the cars on the connecting tracks is not a mere switching operation that is incidental to a regular train movement. Instead, it is an actual part of the through movement of the traffic without which there would be no through movement by the defendant carriers. It is the sole means by which traffic that would otherwise move over other routes via other carriers may be obtained by defendants. Through the use of the connecting tracks, defendants have established a through route for the handling of traffic and, as stated by the Supreme Court in Atlantic Coast Line R. Co. v. Riverside Mills, 219 U.S. 186, 198, 31 S.Ct. 164, 55 L.Ed. 167, 31 L.R.A.,N.S. 7, through this method, a situation has been brought about by which, through independently managed, connecting carriers become in effect one system." 307 I.C.C. 311, 315.

Having determined that it had jurisdiction, the Commission concluded that the public convenience and necessity did not require the operation of the connecting and interchange tracks between the lines of the two carriers. It ordered that the operation of the connecting and interchange tracks be discontinued.

The order of the Commission was reviewed by a three-judge district court of the Eastern District of Wisconsin. It concluded that because there were no scheduled or regular through train move-

ments over the trackage, because no loading platforms were maintained, because no railway agents were on duty, and because the connection did not extend into new territory, it was not an "extension" under the Act. The court regarded it as inconceivable that a relatively short rail connection over which cars are shifted from one railroad to another could be otherwise regarded than as a switching track. Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. United States, E.D.Wis.1963, 214 F. Supp. 244. Reversing by a two line per curiam opinion, the Supreme Court said: "The judgment is reversed. Texas & P. R. Co. v. Gulf C. & S.F. R. Co., 270 U.S. 266, 278 [46 S.Ct. 263, 266, 70 L.Ed. 578]." Chicago & Northwestern Railway Co. v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 380 U.S. 448, 85 S.Ct. 1102, 14 L.Ed.2d 151, reh. den. 381 U.S. 907, 85 S.Ct. 1445, 14 L.Ed.2d 289.

The district court, in the case before us, noted that the reference in the Supreme Court's per curiam reversal was to a page of the report of the Texas & Pacific Railway case in which mention was made of an extension into territory served by another railroad.[13] It concluded that since Track B and Track C did not create new through routes or extend the lines of the New Orleans Terminal Co., these tracks were merely incidental to the functioning of Track A and, that although the tracks were used for interchange they were nevertheless switching tracks. It was decided that the ordinances were valid. New Orleans Terminal Co. v. Spencer, D.C., 255 F. Supp. 1.

The judgment of the district court was, we think, predicated upon an erroneous conception of the distinction between "a line of railroad or extension thereof" and spur, industrial, team, switching or side tracks." If there are traffic movements which are part of the actual transportation haul from ship-

---

13. After the reversal of the Republic Junction decision, the district court dismissed the complaint and in so doing construed the Supreme Court's reversal as a ruling that the connection was an extension. Chicago, Milwaukee, St. Paul & Pacific Railroad Co. v. United States, E.D.Wis.1965, 242 F.Supp. 698.

per to consignee, then the trackage over which the movement takes place is a "line of railroad, or extension thereof," and there can be no abandonment of such trackage without obtaining a certificate of public convenience and necessity from the Interstate Commerce Commission. If, however, the trackage is used in the loading, reloading, storage and switching of cars incidental to the receipt of shipments by the carrier or their delivery to the consignee, then such trackage is "spur, industrial, team, switching or side tracks" and as such, not under Commission jurisdiction.

The district court tested the jurisdiction by the effect which the removal of Tracks B and C would have upon the safety, adequacy, cost efficiency, development, coordination and preservation of our National transportation system in general and the trackage here involved in particular. The district court concluded that the abandonment of Tracks B and C would not economically jeopardize service to the public. It determined that Tracks B and C do not form part of an independent through route, invade the territory of other carriers or affect competition. Using these tests as a guide, the district court decided that Tracks B and C were switching or side tracks and that the challenged ordinances were valid.

As already noted, the New Orleans Terminal Company is a part of the Southern Railway System. It is not, as its name might indicate, merely a terminal facility. It is engaged in the handling of freight movements, both interstate and intrastate, from, to and through the metropolitan area of New Orleans. Tracks B and C, in no small part, are utilized in the handling of these traffic movements. They are not spur, industrial, team, switching or side tracks. They are a part of the line of railroad of the New Orleans Terminal Company. As such, they cannot be abandoned, nor can their abandonment be required by Jefferson Parish unless a certificate of abandonment be issued by the Interstate Commerce Commission.

The use of the tracks as passing tracks, for the temporary storage of cars and for occassional switching operations does not make them any the less "lines of railroad" since they are used substantially in the through movement of freight.

The matters upon which the district court relied, and the grievances of the Parish against the railroad,[14] are matters which might be urged to the Commission if its jurisdiction is invoked for authorization to require the abandonment of the tracks. They are not pertinent as to the question which is before us. Neither do we have any question as to whether the Parish, in the exercise of its police power, may regulate the use of the crossings by the railroad.

The Parish may make application to the Interstate Commerce Commision for an abandonment order. City of Des Moines, Iowa v. Chicago & North Western Railway Company, 8th Cir. 1959, 264 F.2d 454. Pending action by the Commission, if its jurisdiction is invoked, the district court should retain jurisdiction of the cause, issue a temporary injunction against the Parish to preserve the status quo until a decision by the Commission is reached and then proceed as may appear to be proper.

The judgment of the district court is reversed, the cause is remanded to the district court to permit Jefferson Parish to apply to the Interstate Commerce Commission for an abandonment order, to enter a temporary injunction against Jefferson Parish to stay the enforcement of its ordinances, to make such injunction permanent in the event the Parish shall not make application to the Commission within such reasonable time as the district court shall fix, and to retain jurisdiction of the cause for the ultimate disposition thereof as may become appropriate.

Reversed and remanded with directions.

14. See note 2, supra.