**RAILWAY LABOR EXECUTIVES ASSOCIATION, et al., Plaintiffs-Appellants,**

v.

**The CITY OF GALVESTON, TEXAS, acting By and Through The BOARD of TRUSTEES of the GALVESTON WHARVES, Defendants-Appellees.**

No. 87–6169.

United States Court of Appeals, Fifth Circuit.

June 23, 1988.

William J. Birney, Highway & Mahoney, Washington, D.C., for plaintiffs-appellants.

Ralph J. Moore, Jr., Shea & Gardner, Washington, D.C., for amicus curiae: National Ry. Labor Conference.

A. L. Dent, III, Fulbright & Jaworski, Houston, Tex., McLeod, Alexander, Powel & Apffel, Benjamin R. Powel, Galveston, Tex., for City of Galveston, Texas.

Slover & Loftus, Kelvin J. Dowd, Donald G. Avery, Washington, D.C., for Galveston Ry.

Before RUBIN and POLITZ, Circuit Judges, and DUHE *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

Faced with operating losses, the port of Galveston, Texas, decided to sell its railroad assets and lease its railroad terminal facilities to a newly-formed rail company. The Interstate Commerce Commission, acting under a procedure authorized by the Staggers Act of 1980, gave expedited approval to the sale/lease without imposing conditions to protect railway workers at the port. Executives of the unions representing the workers, however, sued to enjoin the transaction until Galveston had bargained over its effects as mandated by the Railway Labor Act of 1926. The district court refused to grant a preliminary injunction because such an order would impermissibly attack the ICC's approval of the transaction, 685 F.Supp. 158. Following the lead of the Court of Appeals for the Third Circuit in *Railway Labor Executives Association v. Pittsburgh & Lake Erie Railroad Co.,*[1] we hold that the injunction would not impermissibly contravene the Commission's approval and that the deregulatory provisions of the Staggers Act do not implicitly repeal the protections afforded workers in this context by the Railway Labor Act. We therefore reverse and remand for the district court to determine whether the Railway Labor Act requires that the injunction be issued.

I.

Galveston Wharves consists of extensive wharves and terminal facilities owned by the City of Galveston, Texas, and located at the entrance to Galveston Bay. Pursuant to Galveston's city charter, these operations are managed by the Wharves' Board of Trustees. For many years, Galveston Wharves has owned and operated a terminal railroad that runs five locomotives over 38 miles of track and employs about 85 persons. Galveston Wharves has a collective bargaining agreement with each of the railway labor organizations representing the various crafts and classes of railroad workers employed by it.

In 1985 and 1986, Galveston Wharves suffered economic losses that imposed a severe strain on its financial resources. Consequently, in March 1987 its management opened discussions with the unions in an effort to obtain substantial wage and work-rule concessions. The discussions ended in May, without agreement.

After consultation with an investment banking firm, Galveston Wharves proposed to sell all of its railroad assets and to lease its terminal railroad facilities to a new firm, Galveston Railway, Inc. (GRI). On September 29, 1987, Galveston Wharves announced that it would proceed with these transactions unless the unions agreed to accept a 26.4 percent reduction in existing wages and benefits, a figure the investment firm had calculated would be necessary to achieve the same savings afforded by the lease agreement.

A month later, after the unions refused to make the concessions, Galveston Wharves' Board approved the documents required for the transactions. The lease, which runs for a term of 10 years, states that GRI will provide switching services at the Port of Galveston in accordance with Galveston Wharves' existing tariffs and contracts. Galveston Wharves reserves

---

* District Judge of the Western District of Louisiana, sitting by designation.

1. 845 F.2d 420 (3d Cir.1988), *pet. for cert. filed,* 56 U.S.L.W. 3839 (May 17, 1988).

the right to manage and inspect the facilities and to approve in advance any changes in the tariffs.

On the same day, October 20, GRI filed a notice of exemption with the Interstate Commerce Commission, seeking an exemption from the provisions of § 10901 of the Interstate Commerce Act,[2] a section requiring a newly formed carrier that seeks to lease and operate an existing rail line to obtain prior approval of the Commission. GRI invoked the Commission's authority under § 10505 of the Act[3] to exempt a transaction from the requirements of § 10901.

In 1985, pursuant to this authority, the ICC in *Ex Parte No. 392*[4] had adopted a class exemption for substantially all § 10901 acquisitions and operations. Under the class exemption, such transactions automatically become effective seven days after notice is filed with the Commission unless a petition to revoke the exemption has been filed and granted or the Commission stays the transaction.[5] The Commission declined to impose employee-protective conditions on this class of transactions on the ground that [e]mployee protection "would discourage acquisitions and operations that should be encouraged" in order to eliminate lines that cannot operate economically.[6] The Commission stated that it was prepared to impose labor protection only in an "extraordinary case."[7]

After the ICC's approval of the sale/lease became effective, this suit was promptly filed by the Railway Labor Executives Association, an unincorporated association of the chief executive officers of the 19 labor organizations that collectively represent all of the organized railroad employees at Galveston Wharves as well as most of the organized rail employees in the United States. The Association contended that

the sale/lease and Galveston Wharves' abrogation of its collective bargaining agreements with the unions constituted unilateral changes in existing agreements in violation of the Railway Labor Act,[8] which prohibits an employer from making unilateral changes in its employees' rates of pay, rules, and working conditions while the parties are complying with the Act's mandatory bargaining requirements.[9] The Association sought to enjoin Galveston Wharves from leasing the facilities and "from abrogating its collective bargaining agreements in violation of the mandatory requirements of the Railway Labor Act."

The district court issued a temporary restraining order prohibiting the transfer, but, after a hearing, the court dissolved the order on November 4. The court found that the sale or lease of the railroad property required authorization by the ICC; the Commission had approved the transaction; issuance of the injunction would forestall consummation of the sale and lease; and such an injunction would contravene and constitute an impermissible collateral attack on the order of the Commission. Under 28 U.S.C. §§ 2321 and 2342, the courts of appeals have exclusive jurisdiction to review ICC orders. The district court did not therefore reach the question whether Galveston Wharves had violated the Railway Labor Act.

The day after the district court's order, Galveston Wharves and GRI consummated the agreement, and Galveston Wharves discharged all of its railroad operating employees.

On appeal, we remanded to the district court for it to enter a statement of the factual bases on which it had concluded the facilities were rail lines subject to ICC jurisdiction. The district court having entered those findings, the case was resubmitted to

---

2. 49 U.S.C. § 10901.

3. 49 U.S.C. § 10505.

4. Ex Parte No. 392 (Sub-No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. § 10901, 1 I.C.C.2d 810 (1985), *review denied as Illinois Commerce Com'n v. I.C.C.,* 817 F.2d 145 (D.C. Cir.1987).

5. *Id.* at 816–17.

6. *Id.* at 813.

7. *Id.* at 815.

8. 45 U.S.C. §§ 151–188.

9. 45 U.S.C. § 152 Seventh, § 156.

this panel on the briefs originally filed and on letter briefs discussing the district court's supplemental findings of fact.

## II.

The decision to grant or deny preliminary, as opposed to ultimate, relief involves a measure of discretion to be exercised by the district judge, and we will reverse only for abuse of discretion.[10] In reviewing the findings underlying the decision to grant or deny relief, however, we make the familiar distinction between factual determinations and legal conclusions, accepting the former unless they are clearly erroneous but exercising independent judgment concerning the latter.[11]

## III.

■ The parties first dispute whether the ICC had jurisdiction over the Galveston facilities so as to authorize their sale and lease. The Interstate Commerce Act gives the Commission jurisdiction to approve and regulate acquisitions of "railroad line[s]" but exempts "spur, industrial, team, switching, or side tracks" located within a single state.[12] Whether a section of track is a rail line or a switching or spur track is a mixed question of law and fact on which we exercise independent review,[13] but the underlying facts found by the district court must be accepted, under Fed.R.Civ.P. 52(a), unless they are clearly erroneous.[14]

■ Whether a track is a rail line or switching or spur track turns on its use and intended use. As we declared in *New Orleans Terminal Company v. Spencer:*

If there are traffic movements which are part of the actual transportation haul from shipper to consignee, then the trackage over which the movement takes place is a "line of railroad, or extension thereof." ... If, however, the trackage is used in the loading, reloading, storage and switching of cars incidental to the receipt of shipments by the carrier or their delivery to the consignee, then such trackage is "spur, industrial, team, switching or side tracks" and as such, not under Commission jurisdiction.[15]

■ On remand from our previous order, the district court found that these rail facilities provide for the transportation of cargo between line-haul rail carriers and sea-going vessels engaged in interstate and foreign commerce and that they perform a function that is an integral and vital part of the through movement of goods in such commerce. The court found that the railroad serves as the agent for line-haul railroads and its charges are absorbed by the line-haul carriers. While this function is sometimes called "switching," it is not merely incidental to train movement; it is, the court found, "a necessary link in the transportation under the through bill of lading"[16] and hence "part of the actual transportation haul from shipper to consignee."[17] The district court concluded that, therefore, the line is a "rail line" and not a "spur track" or "switching track."

We accept the district court's findings of fact, for they are not clearly erroneous, and agree with its conclusion that the track in question is part of the actual transporta-

---

**10.** *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974) (*cited in Mississippi Power & Light v. United Gas Pipe Line,* 760 F.2d 618, 621 (5th Cir.1985)).

**11.** *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 710 (5th Cir.1984); *Apple Barrel Productions, Inc.,* 730 F.2d 384, 386 (5th Cir.1984); *see also In re Fredeman Litigation,* 843 F.2d 821, 824 (5th Cir.1988).

**12.** 49 U.S.C. §§ 10901, 10907(b).

**13.** *Compare New Orleans Terminal Company v. Spencer,* 366 F.2d 160, 164 (5th Cir.1966); *Illinois Commerce Com'n v. United States,* 779 F.2d 1270, 1271 (D.C.Cir.1985).

**14.** *See also Georgia Southern & Fla. Ry. Co. v. Duval Connecting R. Co.,* 324 F.2d 801, 802 (5th Cir.1963).

**15.** *New Orleans Terminal Company,* 366 F.2d at 165–66; *see also Nicholson v. I.C.C.,* 711 F.2d 364, 367 (D.C.Cir.1983).

**16.** *See Galveston Wharf Co. v. Galveston, Harrisburg & San Antonio Railway Co.,* 285 U.S. 127, 134, 52 S.Ct. 342, 344, 76 L.Ed. 659 (1932).

**17.** *New Orleans Terminal Company,* 366 F.2d at 166.

tion haul and is therefore a railroad line. The Commission had jurisdiction to approve the sale/lease.

## IV.

After we had heard oral argument, the Court of Appeals for the Third Circuit decided *Railway Labor Executives Association v. Pittsburgh & Lake Erie Railroad Co.,* [18] in which it considered each of the issues presented in this case. That opinion gives the history of the Railway Labor Act of 1926 [19] and of the Interstate Commerce Act as amended by the Railroad Revitalization and Regulatory Reform Act of 1976 [20] and, particularly, the Staggers Act of 1980. [21] In a thorough 60–page opinion, Judge Edward Becker reviewed the identical arguments made before us and held that the statutes amending the Interstate Commerce Act did not implicitly repeal the Railway Labor Act and did not authorize the ICC to exempt the sale of a railroad from the provisions of the RLA. In a discerning 10–page dissent, Judge William Hutchinson adopted a contrary view.

As the majority opinion in *Pittsburgh & Lake Erie Railroad* points out, the Railway Labor Act and the Interstate Commerce Act as amended by the Staggers Act reflect two different sets of congressional policies and therefore make uncomfortable bedfellows. The Staggers Act evinces a concern "to eliminate the imposition of costly government-imposed conditions on otherwise efficient transactions, and, perhaps most importantly, to expedite the approval process so that efficient transactions are not derailed by regulatory red tape." [22] As part of the Staggers Act, Congress in 49 U.S.C. § 10505 granted the ICC broad authority to exempt rail transactions from the approval process, and the Com-

mission has implemented this policy by the class exemption it granted to such transactions in *Ex Parte 392.*

The Railway Labor Act, on the other hand, "is expressly designed to delay certain management decisions, in order to give rail labor more leverage." [23] Such leverage includes the power of labor to obtain an injunction in federal court ordering management to maintain the status quo until the two sides have exhausted the extensive bargaining and mediation processes described in the Act. [24]

In the case before us, the district court concluded, citing the Second Circuit's decision in *Railway Labor Executives Association v. Staten Island R.R.,* [25] that to issue an injunction staying consummation of the sale/lease would constitute an impermissible collateral attack on the order of the ICC that authorized the transaction. Under 28 U.S.C. §§ 2321 and 2342, the courts of appeals have exclusive jurisdiction to review Commission orders. [26]

The Third Circuit in *Pittsburgh & Lake Erie Railroad* addressed this argument, rejecting it for two reasons that are fully applicable to this case:

[First, t]he ICC approved this proposed sale under § 10901, which says that a transaction *"may "* proceed given a finding that the public interest *"require[s] or permit[s]"* the acquisition, 49 U.S.C. § 10901(a) (emphasis added). Thus, the ICC has made no finding that the public interest *requires* this transaction, that the transaction *must* proceed, or that a delay in (or even collapse of) the transaction would *harm* the public interest. Therefore, the district court's injunction does not conflict with the public interest as determined by the ICC's order, be-

---

18. 845 F.2d 420 (3d Cir.1988).

19. 45 U.S.C. §§ 151–188.

20. Pub.L. No. 94–210, 90 Stat. 31.

21. Pub.L. No. 96–448, 94 Stat. 1895, *reprinted in* 1980 U.S.Code Cong. & Admin.News 3978, 3998.

22. *Pittsburgh & Lake Erie Railroad,* 845 F.2d at 436.

23. *Id.* at 436.

24. *See* 45 U.S.C. § 156; *Detroit & Toledo S.L.R. Co. v. United Transportation Union,* 396 U.S. 142, 149–51, 90 S.Ct. 294, 299–300, 24 L.Ed.2d 325 (1969).

25. 792 F.2d 7 (2d Cir.1986).

26. *Id.* at 12.

cause the injunction merely granted a *delay* in the transaction, and the possibility that labor might win some protection for itself at the bargaining table.

.   .   .   .   .

[Second,] the ICC merely refused to *impose* labor protective conditions on the transaction.... [T]he status quo injunction [would] not require any substantive protection for labor; it merely requires that the parties bargain, a process which may well produce no substantive agreement.... [B]argained-for concessions may be substantially less burdensome to the railroad than the typical substantive conditions imposed by the Commission. Put differently, the enforcement of the union's procedural rights should not be viewed as an attack on the ICC's determination that burdensome substantive protections would be detrimental to the public interest.[27]

The Third Circuit specifically considered the Second Circuit's decision in *Staten Island R.R.* and distinguished it as follows:

The sale of the Staten Island Railroad was approved pursuant to § 10905, rather than § 10901. Section 10905 is a forced sale provision, requiring a financially ailing railroad to sell its assets to a financially responsible purchaser, as an alternative to abandonment of the line under § 10903. The ICC order in that case therefore stated that the seller "*must* complete the sale so long as the buyer consummates." 792 F.2d at 11 (emphasis added). The court therefore held that an injunction against sale could not be granted "without re[s]cission or modification of the ICC's order" ...; such an attack, of course, would only be appropriate on direct appeal from the ICC order.

P & LE argues [as do amici in this case] that the distinction between a mandatory and permissive ICC order has

been rejected by the Supreme Court in *Venner v. Michigan Cent. R.R. Co.*, 271 U.S. 127 [46 S.Ct. 444, 70 L.Ed. 868] (1926).... The case, however, is inapposite, both because the requested injunction truly would have blocked the approved transaction as violative of state law, as opposed to merely delaying the transaction pending the exhaustion of bargaining, and because the case, at bottom, was a federal preemption case, declaring that *state* law could not be used to undermine a transaction once a federal law has preempted the field and a federal agency has passed on the very same issues.[28]

■ We adopt these views, recognizing, as did the Third Circuit, that a long delay occasioned by the RLA's bargaining process "could effectively kill the proposed transaction and ultimately push the railroad into a bankruptcy proceeding,"[29] to the benefit of neither Galveston nor the unions and in derogation of both congressional intent and the ICC order. Because, however, "Congress has not updated ... the RLA to keep it in tune with newer policies," to disallow the unions from seeking the injunction would effectively abrogate the RLA in this situation, since the Commission is not authorized to order the parties to commence RLA bargaining procedures and since labor protection is only one of fifteen factors the Commission is directed to consider in setting transportation policy.[30]

Like the Third Circuit, we cannot conclude that the Staggers Act "preempts"— that is, implicitly repeals—the RLA in this context. The Supreme Court has recently reemphasized that repeals by implication are disfavored and "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."[31] Again we adopt the

---

**27.** *Pittsburgh & Lake Erie Railroad*, 845 F.2d at 437, 440 (footnotes omitted).

**28.** *Id.* at 438 n. 27 (some citations omitted).

**29.** *Id.* at 438.

**30.** *Id.* at 441–42; *see* 49 U.S.C. § 10101a.

**31.** *Traynor v. Turnage*, —— U.S. ——, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988) (*quoting Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974)).

Third Circuit's detailed discussion of this issue, which the court summarized as follows:

> Dominating our thinking, however, is a reluctance to impinge on a congressional statutory mandate (the RLA) without a clear congressional authorization (and we find none), or to find an implied repeal of the requirements of the venerable Railway Labor Act without an unavoidable conflict between the mandates of the two statutes (and such a conflict is not ineluctable). See *Watt v. Alaska,* 451 U.S. 259, 266–67 [101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80] (1981). We are particularly reluctant to find such a repeal here, where Congress has so recently addressed itself to deregulating the rail industry, yet has not chosen to relieve management of any of the onerous burdens imposed by the RLA. Moreover, because the Commission's approval of the transaction was merely permissive, we do not view an injunction against the sale as an attack on the ICC's order; and because the approval stemmed from a process in which labor's interests are only one of fifteen factors considered by the Commission, we do not believe that Congress intended that rail labor rely solely on the ICC for protection, to the exclusion of labor's rights under the RLA. For these reasons, we conclude that Congress did not intend the Commission's approval of the transaction without the imposition of substantive labor protective conditions to relieve the railroad of its obligation to comply with the exclusive congressionally-mandated RLA dispute resolution procedures.[32]

The Third Circuit's opinion then concludes:

> We are fully aware of the unfortunate ramifications and irony of our decision. A bargaining order, and a status quo injunction, designed to foster conciliation, promote labor peace, and ultimately keep the rails running, may ultimately have the perverse effect of destroying the only chance [the Railroad] has for survival and perhaps even the very jobs that the unions are now trying to protect. Although we are not happy with this result, we feel constrained to reach it, because the Supreme Court has appropriately admonished the judiciary not to apply its own brand of "common sense" in the face of a contrary statutory mandate. *See TVA v. Hill,* 437 U.S. 153, 193–95 [98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117] (1978).
>
> We recognize, of course, that the statutory mandate is in tension with more recent congressional policies. However, we do not feel free to translate those abstract policies into a repeal of a blackletter law. If we have misinterpreted congressional intent, we can only hope that Congress speaks more clearly and consistently quite soon.
>
> We nevertheless will urge the National Mediation Board, to the extent it is within the Board's powers, to minimize the burden on the railroad, if possible. The Board's ultimate goal, of course, should be to promote conciliation and possibly agreement. Naturally, as long as this continues to be a reasonable possibility, the Board should conduct itself in the usual manner and refrain from releasing the parties from mediation. However, this need not become an "interminable" process. We would hope that the Board, in deference to the plight of the railroad, and to the competing congressional policy favoring expedited regulatory approvals, would streamline its procedures to the extent possible and not keep the parties in mediation any longer than absolutely necessary. When progress is no longer forthcoming, we would hope that the Board would release the parties, forthwith. In sum, it would seem that this case need not require the "purposely long and drawn out" approach of more typical major railway disputes, that such delay runs counter to the public interest, and, in fact, that congressional intent might well require something much more expeditious.[33]

**32.** *Pittsburgh & Lake Erie Railroad,* 845 F.2d at 423.

**33.** *d.* at 446–47 (footnotes, some citations omitted).

We adopt these views. Although the Eighth Circuit has recently reached a contrary conclusion, holding that the Staggers Act implicitly repeals the Railway Labor Act in this context,[34] we find the Third Circuit's reasoning more persuasive. Accordingly, we reverse the district court order denying a preliminary injunction and remand the case to that court to determine, in accordance with this opinion, whether Galveston Wharves has violated the Railway Labor Act and an injunction should issue. Although the remaining issues may be pure questions of law, we do not wish to pass on them without the benefit of the district court's findings and conclusions. The ultimate grant or denial of an injunction may, of course, be the subject of a future appeal, and we therefore express no opinion concerning its merits. We do, however, urge the district court, should it grant injunctive relief, to fashion it in such a manner as to minimize the burden on Galveston Wharves, if possible.

The judgment of the district court is REVERSED and REMANDED for further proceedings consistent with this opinion.

**34.** *Burlington Northern Railroad Co. v. United Transportation Union,* 848 F.2d 856 (8th Cir. 1988); *Railway Labor Executives Association v.* *Chicago and Northwestern Transportation Co.,* 848 F.2d 102 (8th Cir.1988).