### RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Plaintiffs–Appellants,

v.

### The CITY OF GALVESTON, TEXAS, acting By and Through the BOARD OF TRUSTEES OF THE GALVESTON WHARVES, Defendants–Appellees.

#### No. 87–6169.

United States Court of Appeals, Fifth Circuit.

March 14, 1990.

Ralph J. Moore, Jr., Shea & Gardner, Washington, D.C., for amicus curiae, Nat. Railway Labor Conference.

Dick Dent, Fulbright & Jaworski, Houston, Tex., Benjamin R. Powel, McLeod, Alexander, Powel & Apffel, Galveston, Tex., for City of Galveston.

Kelvin J. Dowd and Donald G. Avery, Slover & Loftus, Washington, D.C., for Galveston Ry.

Before RUBIN, POLITZ, and DUHÉ, Circuit Judges.

## ON PETITION FOR REHEARING

ALVIN B. RUBIN, Circuit Judge:

The Railway Labor Executives' Association (RLEA) asks us to reconsider our recent order remanding this case to the district court.[1] We decline to do so. Because the RLEA's petition raises questions concerning the proper interpretation to be given the Supreme Court's recent opinion in *Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Association*,[2] questions that, because of their public importance, demand thorough and considered treatment, we will set forth the reasons for our decision in detail.

### I.

We decided the RLEA's appeal before the Supreme Court issued its opinion in *P & LE*, an opinion that changed the relevant legal landscape considerably. Not surprisingly, some of the facts contained in the record but not discussed in our original opinion have become relevant. We therefore find it necessary to supplement our earlier statement of the facts.[3]

The City of Galveston, a home-rule city, has for many years owned wharves and real estate near the entrance to Galveston Bay. Pursuant to the City's charter, Gal-

William J. Birney, Highway & Mahoney, Washington, D.C., for plaintiffs-appellants.

1. *Railway Labor Executives Ass'n v. City of Galveston*, 883 F.2d 16 (5th Cir.1989) (per curiam), *modifying* 849 F.2d 145 (5th Cir.1988).

2. — U.S. —, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989).

3. *See* 849 F.2d at 146–48.

veston Wharves, the port authority for the City, owned and operated a terminal railroad facility that served the wharves. At the time that this dispute arose, Galveston Wharves employed a number of persons whose responsibilities were in some way connected with the operation of the railroad. Although the RLEA alleges that there were 85 such employees, testimony taken at the hearing on the preliminary injunction indicates that there may have been as few as 24, of whom 11 were on furlough.

The various crafts and classes of employees were represented by several unions, each of which had entered into a collective bargaining agreement with Galveston Wharves. All but one of the unions also had entered into "standby agreements" with Galveston Wharves, which provided that the parties would be bound by certain "national agreements" that had been reached by representatives of the various unions and the National Railway Conference, the representative of several major carriers. The national agreements, which expired on June 30, 1988, forbade the parties to initiate negotiations, pursuant to § 6 of the Railway Labor Act (RLA),[4] to change the agreements before April 1, 1988.

Galveston Wharves sustained severe economic losses during 1985 and 1986, mostly as a result of its railroad operations. It could not simply stop operating the railroad whose service was essential to the operation of the wharves. Therefore, it decided that it must either reduce railroad operating expenses dramatically or find a buyer for the railroad. Galveston Wharves, however, faced a serious obstacle to an outright sale of the railroad: the City itself still held the title to the land on which the rails and switching stations were situated. Galveston Wharves therefore proposed to sell its other railroad assets and to lease those assets that it could not sell.

After obtaining a tentative commitment from a prospective buyer-lessee, Galveston Railway, Inc. (GRI), Galveston Wharves an-nounced its plans to the railway unions and informed them that it would proceed with the transactions unless they agreed to accept a 26.4 percent reduction in existing wages and benefits. Galveston Wharves' investment banking advisor had calculated that a reduction in labor costs of that magnitude would have been necessary for it to achieve the same savings afforded by the sale-lease agreement. The unions balked.

One month later, the trustees of Galveston Wharves approved the documents required to complete the transaction. The lease, which has a term of ten years, provides that GRI will provide switching services in accordance with Galveston Wharves' existing tariffs and contracts. It further reserves to Galveston Wharves the right to manage and inspect the facilities and to approve any changes in the tariffs. Later, the ICC approved this agreement.

After the ICC had registered its approval, the RLEA, an association of the chief executive officers of the unions that represented the organized railroad workers at Galveston Wharves, filed this suit. The RLEA sought two forms of relief. First, it sought a declaratory judgment that the proposed transaction would bring about changes in existing collective bargaining agreements in violation of § 6 of the RLA. Second, it requested a preliminary and permanent injunction restraining Galveston Wharves from completing the transaction and from abrogating its collective bargaining agreements with the railroad employees. The district court denied the preliminary injunction. Observing that the ICC had approved the Galveston Wharves–GRI agreement and that the courts of appeals have exclusive jurisdiction to review orders of the ICC,[5] that court concluded that the RLEA's effort to block the agreement constituted an impermissible collateral attack on such an order.

The day after the district court's ruling, Galveston Wharves and GRI consummated the agreement. Galveston Wharves then promptly discharged all of the employees in

---

**4.** 45 U.S.C. § 156 (1982).

**5.** *See* 28 U.S.C. §§ 2321(a), 2342(5) (1982 & Supp. V 1987).

its railroad department. It nevertheless retained several employees—most of them clerical workers—who had been represented by the railway unions but had not actually worked in the railroad department.

On appeal, we remanded to the district court with instructions that it provide a statement of the grounds on which it had concluded that the leased facilities were rail lines subject to the jurisdiction of the ICC.[6] After the district court had complied with this order,[7] the parties resubmitted the case. Relying on the reasoning of the Third Circuit in *Railway Labor Executives' Association v. Pittsburgh & Lake Erie Railroad Co.*,[8] we concluded that the injunction sought by the RLEA would not have impermissibly contravened the ICC's approval of the transaction. We therefore reversed the district court's ruling and remanded for the district court to determine whether the RLA required that the injunction be issued.[9]

The Galveston Wharves & GRI promptly filed an application for a writ of certiorari with the United States Supreme Court. While that application was pending, the Court reversed the Third Circuit's judgment in *P & LE*.[10] The Court then vacated our judgment in this case and remanded the case to us "for further consideration in light of *Pittsburgh & Lake Erie Railroad Company v. Railway Labor Executives' Association.*"[11] We in turn remanded to the district court with directions that it deny the request for the injunction and take such further action, if any, that would be consistent with the opinion of the Supreme Court in *P & LE*.[12]

## II.

The RLEA concedes that the case should be remanded, but "for the limited purpose of entering findings of fact and conclusions of law concerning the Railway Labor Act obligations of the Wharves, and whether these obligations can be enforced, including by injunction." [13] The RLEA's contention is premised on the assumption that additional factfinding is necessary before this court can determine whether the RLA authorized the issuance of an injunction against Galveston Wharves. For the reasons set forth below, however, we conclude that even if the factual allegations of the RLEA are correct, the RLA nevertheless does not entitle it to injunctive relief.

## III.

### A.

In its petition for rehearing, the RLEA maintains that § 6 of the RLA authorizes the issuance of an injunction restraining Galveston Wharves from going through with its agreement with GRI. Its conclusion can be reached through either of two routes, the first of which is relatively simple. The sale/lease transaction with GRI itself required a "change in agreements affecting rates of pay, rules, or working conditions" of the *terminated* employees. Under the terms of § 6, Galveston Wharves was therefore required to provide notice of the transaction and, before completing it, to bargain with the unions about the effects of the transaction. In this argument, the RLEA apparently does not maintain that Galveston Wharves was required to bargain with the unions about the decision to enter into the agreement with GRI, but only about the impact this agree-

6. *Railway Labor Executives Ass'n v. City of Galveston*, No. 87–6169, slip op. (5th Cir. Mar. 7, 1988).

7. *See Railway Labor Executives' Ass'n v. City of Galveston*, 685 F.Supp. 158, 159–60 (S.D.Tex. 1987) (supplemental findings entered Apr. 18, 1988).

8. 845 F.2d 420 (3d Cir.1988).

9. *Railway Labor Executives Ass'n v. City of Galveston*, 849 F.2d 145 (5th Cir.1988).

10. *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Ass'n*, —— U.S. ——, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989).

11. *City of Galveston v. Railway Labor Executives' Ass'n*, —— U.S. ——, 109 S.Ct. 3207, 106 L.Ed.2d 559 (1989).

12. *Railway Labor Executives Ass'n v. City of Galveston*, 883 F.2d 16 (5th Cir.1989) (per curiam), *modifying* 849 F.2d 145 (5th Cir.1988).

13. Brief of Appellants at 2.

ment would have had on Galveston Wharves' employees.

The second proposed route is more tortuous. In connection with the transaction between Galveston Wharves and GRI, the RLEA contends, Galveston Wharves changed the rates of pay and working conditions of the *retained* employees during the term of the collective bargaining agreements, a change that triggered the notice, bargaining, and status-quo requirements of § 6. The RLEA asserts that this third requirement forbade Galveston Wharves to implement its agreement with GRI.

### 1.

■ The answer to the RLEA's first argument is found in *P & LE*. P & LE, a small rail carrier faced with enormous recurring operating losses, agreed to sell almost all of its assets to a newly organized rail company, CWP. CWP planned to operate the railroad as had P & LE, except that it would not assume the collective bargaining agreements between P & LE and the employees' unions and would employ a workforce only one-third the size of P & LE's. When P & LE declined the unions' invitation to negotiate regarding the proposed sale, the unions promptly filed notices, pursuant to § 6 of the RLA, proposing certain changes in the existing collective bargaining agreements that would in effect have barred the proposed transaction. P & LE again refused to bargain. The RLEA, on behalf of the unions, then sought (i) a declaratory judgment that P & LE was required to bargain with the unions and to maintain the status quo pending the completion of that bargaining and (ii) an injunction restraining P & LE from proceeding with the sale. Conceding that the sale itself was not a subject of mandatory bargaining, the RLEA nevertheless argued that, under the RLA, P & LE was required to bargain about the *effects* of the sale and could be restrained from consummating the

sale until bargaining ended. The district court eventually granted the injunction and the court of appeals affirmed. P & LE then petitioned for, and the Supreme Court granted, a writ of certiorari.

The issue before the Court was whether the RLA, properly construed, authorized an injunction against closing the sale because P & LE failed to satisfy a duty to bargain about the effects of that sale on its employees.[14] This duty, the Court reasoned, might have arisen in either of two ways: (i) the proposed transaction itself resulted in a change in agreements affecting rates of pay, rules or working conditions of the employees; or (ii) the § 6 notices filed by the unions called for changes in the agreements that required bargaining.[15] The Court's consideration of the first possibility is pertinent to the RLEA's first argument in its petition for rehearing in this case.

A carrier's proposed action will not create a duty to bargain under § 6, the Court noted, unless the action requires a " 'change in *agreements* affecting rates of pay, rules, or working conditions.' "[16] The transaction proposed by P & LE, however, did not "violate or require changing any of the provisions of the unions' written contracts with P & LE."[17] This was so, the Court explained, because none of those agreements contained any provision concerning the possibility of a sale, certainly none that conferred rights on the employees in the event of a sale or that guaranteed that jobs would remain available indefinitely. The Court observed further that the RLEA had not alleged, much less established, the existence of any implied agreements between P & LE and its unions that would be contravened by P & LE's contemplated action.[18] Because P & LE's proposed sale therefore did not require a "change" in any express or implied agreements, the Court concluded that § 6 did not require P & LE to serve a § 6 notice on the

---

**14.** 109 S.Ct. at 2592.

**15.** *Id.*

**16.** *Id.* (quoting 45 U.S.C. § 156 (1982)) (emphasis added by the Supreme Court).

**17.** *Id.* at 2593.

**18.** *Id.*

unions, to bargain about the sale, or to delay its consummation.

Applying these principles to this case, we conclude that the RLEA's first argument does not entitle it to relief. According to *P & LE*, action contemplated by a carrier triggers the notice, bargaining, and status-quo requirements of the RLA only when that action requires a *change in agreements* affecting rates of pay, rules, or working conditions. Nothing in the proposed transaction between Galveston Wharves and GRI would have required such a change in the collective bargaining agreements between Galveston Wharves and its unions. Those agreements do not speak to the possibility that Galveston Wharves might divest itself of its railroad operations through a transaction such as the one with GRI. They certainly contain no provisions purporting to confer rights on employees in the event of such a transaction or to guarantee that jobs would remain available indefinitely on the same terms and under the same conditions as those called for in the collective bargaining agreements. Furthermore, the RLEA has not alleged that Galveston Wharves had impliedly agreed with its unions that it would not enter into such a transaction or that it would protect its employees from adverse consequences in the event it did enter into such a contract. Because Galveston Wharves' proposed action therefore did not violate or require changing any existing express or implied labor-management agreement, that action was not subject to the requirements of § 6 of the RLA.

2.

█ The RLEA's second argument is susceptible of at least two constructions. The first is that the Galveston Wharves–GRI transaction itself caused or brought about a change in the rates of pay and working conditions of the employees retained after the transaction and, therefore, should have been preceded by notice and bargaining. The principal difficulty with this argument is that it rests on a fundamental misunderstanding of the relationship between the transaction and any

changes in rates of pay or working conditions that the retained employees may have suffered. Contrary to the suggestion of the RLEA, the transaction itself neither changed rates of pay, rules, or working conditions of Galveston Wharves' retained employees, nor abrogated the collective bargaining agreements that guaranteed those rates of pay, rules, and working conditions. After implementing the agreement with GRI, Galveston Wharves could have continued to provide the retained employees with the same rates of pay and the same working conditions as those that were called for in the collective bargaining agreements. Any changes in those rates of pay or working conditions, assuming that they did occur as the RLEA alleges, came about as a result of management action that was independent of the Galveston Wharves–GRI transaction. Thus, it is inaccurate to say that the *transaction* changed the rates of pay and working conditions of the retained employees.

The RLEA's argument, however, is susceptible of a different and more sophisticated construction. The management action that triggered the duty to give notice and to bargain under § 6 was not the decision to enter into the transaction with GRI, but the contemporaneous or subsequent decision to change the rates of pay or working conditions of the retained employees. Once the railroad became obligated to give notice and to bargain over those matters, the argument continues, the "status quo" provision of § 6 prevented it from going ahead with its transaction with GRI. Though more complex, this argument is also without merit.

It may well be the case, as the RLEA suggests, that Galveston Wharves' alteration of the rates of pay and working conditions of the retained employees constituted a "change in agreements affecting rates of pay … or working conditions,"[19] one that should have been held in check until Galveston Wharves had given notice of the decision and had bargained with the union. It does not follow, however, that Galveston Wharves was on that account prohibited,

---

**19.** 45 U.S.C. § 156 (1982).

under the status-quo provision of § 6, from completing the transaction with GRI. The "status quo" that § 6 requires a carrier to maintain is circumscribed: once mandatory bargaining is underway (or should be underway), the carrier may not alter "rates of pay, rules or working conditions."[20] Thus, in order for the status-quo requirement to apply to some action contemplated by a carrier, that action must somehow cause or require a change in the carrier's employees' rates of pay, rules, or working conditions.

A moment's reflection will reveal that the agreement between Galveston Wharves and GRI did not cause or require a change in the rates of pay, rules, or working conditions provided for in the collective bargaining agreements or any implied labor-management agreements. As we explained earlier, nothing in the Galveston Wharves–GRI agreement required Galveston Wharves to treat its *retained* employees any differently than it previously had. The subjection of those employees to lower rates of pay and different working conditions, if it in fact occurred, was independent of Galveston Wharves' deal with GRI. Consequently, applying the status-quo requirement of § 6 to bar the transaction cannot be justified on the ground that the retained employees suffered a change in rates of pay or working conditions. Nor did the transaction produce any change in the rates of pay, rules, or working conditions guaranteed by contract to the *terminated* employees. As we stated earlier, the transaction contemplated by Galveston Wharves did not itself require a "change in agreements affecting rates of pay, rules, or working conditions" of the terminated employees. That is simply a different way of saying that the transaction did not change the rates of pay, rules, or working conditions guaranteed in the terminated employees' written or implied labor agreements.

Our inquiry, however, cannot end here. As the Supreme Court pointed out in *P &*

tion afforded by the status-quo provision to noncontractual "objective" working conditions.[21] It is at least conceivable that the transaction between Galveston Wharves and GRI changed one or more working conditions of this kind. The RLEA, however, has neither identified the objective working conditions that were so changed nor given us any reason to believe that it would be able to do so were we to remand for trial.

Even if we assume that the RLEA, if given the opportunity, could establish that the Galveston Wharves–GRI transaction changed certain "objective" working conditions, its argument would still fail. The prohibition against alteration of objective working conditions found in the status-quo provision is not universal in scope; it does not ban changes of *all* such conditions. As the Supreme Court stated in *Detroit & Toledo Shore Line Railroad Co. v. United Transportation Union,* the prohibition extends only to "those actual, objective working conditions *out of which the dispute arose,*" that is, those conditions management efforts to change which have triggered the notice and bargaining requirements of § 6.[22] Here, the controversy is alleged to have arisen not over a management effort to change the retained or terminated employees' *objective* working conditions, but over a management effort to change the retained employees' *contractually-guaranteed* rates of pay and working conditions. Considering the working conditions from which the controversy had its genesis, we are forced to the conclusion that the status-quo requirement did not insulate the objective working conditions of the retained and terminated employees from change. Thus, even if the Galveston Wharves–GRI transaction did change such objective working conditions, it could not have been enjoined on the ground that the status-quo provision, triggered by management's decision to change the contractually-guaranteed

**20.** *Id.*

**21.** 109 S.Ct. at 2593–94; *see also Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

**22.** 396 U.S. 142, at 153, 90 S.Ct. 294, at 301 (emphasis added); *see also Reed v. National Air Lines, Inc.,* 524 F.2d 456, 459 (5th Cir.1975).

rates of pay and working conditions of the retained employees, forbade it.

Considering, therefore, the nature and effects of the transaction between Galveston Wharves and GRI, we conclude that § 6 did not require Galveston Wharves to give the unions notice of the transaction, to bargain with them about the transaction or its effects, or to delay the transaction's implementation. We do not intimate any opinion concerning whether the collective bargaining agreements between Galveston Wharves and its employees imposed on Galveston Wharves a duty to bargain about the effects of the transaction.

### B.

In its petition for rehearing, the RLEA does not contend that its member unions filed § 6 notices like those filed by the unions in *P & LE*, that is, notices requesting that the collective bargaining agreements be changed to include provisions preventing the carrier from entering into the contemplated transaction or protecting the jobs of employees in the event that the carrier should go through with the transaction.[23] Indeed, the RLEA apparently could not have made this contention. Throughout the proceedings, the RLEA has stated that all but one of Galveston Wharves' unions was prohibited, under certain "national agreements," from filing any § 6 notices until June 1, 1988 and has hinted that the one union that was not bound by the national agreements nevertheless chose to abide by their terms. We assume, therefore, that none of the unions filed a § 6 notice with Galveston Wharves.

That the unions did not serve such notices on Galveston Wharves is significant. Unlike the unions in *P & LE*, Galveston Wharves' unions cannot argue, as an alternative ground for the issuance of an injunction against the transaction, that *their notices* imposed on the carrier a duty to bargain about the effects of the transaction and that the status-quo requirement prohibited the carrier from consummating the transaction until the completion of the bargaining process.[24] We express no opinion regarding whether appropriate § 6 notices, had they been filed, would have imposed these obligations on Galveston Wharves.

### IV.

For the reasons presented, the petition for rehearing is DENIED.

---

**23.** 109 S.Ct. at 2589 n. 5.

**24.** *Id.* at 2593.