**MT PROPERTIES, INC., Appellee,**

v.

**TRANSPORTATION–COMMUNICATIONS INTERNATIONAL UNION, Appellant.**

**No. 89–5061.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1989.

Decided Sept. 20, 1990.

Rehearing and Rehearing En Banc Denied Oct. 31, 1990.

Elizabeth A. Nadeau, Washington, D.C., for appellant.

R. Scott Davies, Minneapolis, Minn., for appellee.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Transportation–Communications International Union (TCU) appeals from a final order entered in the United States District

Court[1] for the District of Minnesota, granting MT Properties, Inc.'s (MT) motion for summary judgment. The district court issued a declaratory judgment that the Special Board of Adjustment established pursuant to the Railway Labor Act, 45 U.S.C. §§ 151–188 (1982 & Supp. V 1987) (RLA), lacked jurisdiction under the Washington Job Protection Agreement of 1936 (WJPA) or the Job Stabilization Agreement of February 7, 1965 (Stabilization Agreement) to arbitrate a dispute between TCU and MT. For reversal, TCU argues that the district court erred in holding that MT was relieved of its duty to arbitrate, and, assuming MT was relieved of this duty, the employees represented by TCU were deprived of contractual rights without just compensation in violation of the fifth amendment. We affirm the order of the district court, but for different reasons than those relied on below.

## I.

The Minnesota Transfer Railway Co. (Minnesota Transfer) was formed over 100 years ago by several rail companies to operate terminal rail service in the Minneapolis–St. Paul metropolitan area. As of 1986, Minnesota Transfer employed approximately 30 employees, 10 of whom were represented by TCU. On December 11, 1986, Minnesota Transfer changed its corporate name to MT Properties, Inc., but continued to operate as Minnesota Transfer. Like its predecessor Minnesota Transfer, MT was a "carrier" within the meaning of the RLA. *See* 45 U.S.C. § 151 First.

On February 1, 1987, all of MT's rail assets were acquired through a 50 year lease (the acquisition) by the Minnesota Commercial Railway Co. (MCRC). After the acquisition, MT merged with the St. Paul Union Depot Co. The surviving company kept the name of MT Properties, Inc.[2] In conjunction with leasing its rail assets, MT eliminated its rail operations and abol-

ished all 30 rail-connected jobs, including the jobs of the 10 employees represented by TCU. MT is now solely a real estate holding company.

The Interstate Commerce Act, 49 U.S.C. §§ 10101–11917 (1982 & Supp. V 1987) (ICA) confers broad authority on the Interstate Commerce Commission (ICC) to regulate the railroad industry. At the time of the acquisition, MCRC applied for an exemption from the ICC's acquisition regulations pursuant to *Ex Parte 392 (Sub. No. 1), Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. § 10901,* 1 I.C.C.2d 810 (1986) (*Ex Parte 392*), review denied sub nom. *Illinois Commerce Comm'n v. ICC,* 817 F.2d 145 (D.C.Cir.1987). *Ex Parte 392* exempts rail line sales to new carriers from full compliance with ICC regulations, including those regulations which permit the ICC to impose labor protection conditions on transactions. MCRC's Application for Exemption was published in the Federal Register on February 20, 1987. The exemption became effective seven days after publication.[3] In accordance with the exemption, no labor protection conditions were imposed on the acquisition.

After the exemption, the Brotherhood of Maintenance of Way Employees (BMWE) filed a petition for revocation of the exemption with the ICC. The BMWE claimed that the acquisition constituted an abandonment and sale of a rail line between two carriers and argued that labor protection conditions should be imposed on the MT–MCRC transaction. The ICC denied BMWE's petition for revocation, stating that BMWE had not offered any evidence that the acquisition was a transaction between two carriers.

In a November 4, 1987, letter, TCU requested the National Railway Labor Conference (NRLC), MT's designated representative under the WJPA and the Stabili-

---

1. The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

2. The surviving company also kept "Minnesota Transfer" as its operating name.

3. The ICC modified the Ex Parte 392 procedures in 1988 to extend the waiting period from 7 to 35 days. *See* 53 Fed.Reg. 5981–82 (1988).

zation Agreement, to order its Dispute Committee to decide the proper interpretation and application of the collective bargaining agreements. The NRLC referred the dispute to Special Board of Adjustment No. 605 (Special Board), an arbitration panel established pursuant to the RLA, the WJPA, and the Stabilization Agreement. Both sides have presented their respective positions to the Special Board.

MT subsequently filed suit in the United States District Court for the District of Minnesota, requesting a declaratory judgment that the Special Board lacked jurisdiction and a permanent injunction prohibiting TCU from arbitrating this dispute under the WJPA and the Stabilization Agreement. Both sides moved for summary judgment. After hearing arguments, the district court granted MT's motion for summary judgment as to Count I on January 19, 1989, issuing a declaratory judgment that the Special Board had no jurisdiction under the WJPA or the Stabilization Agreement to resolve the dispute. The district court held that the ICC exemption issued pursuant to *Ex Parte 392* preempts the Special Board's jurisdiction to arbitrate this dispute under the RLA. This appeal followed.

## II.

This case requires us to reconcile the competing statutory requirements and policy objectives of the RLA and the ICA in the context of a rail carrier's decision to transfer its assets by a long-term lease and leave the railroad business. TCU argues that the Supreme Court's recent decision in *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n*, — U.S. —, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989) (*Lake Erie*), controls this case and mandates reversal of the district court's order. TCU contends that the *Lake Erie* decision undercuts the district court's holding that the ICC exemption preempts the jurisdiction of the Special Board. According to TCU, the district court's holding that the ICA supersedes the RLA is at variance with *Lake Erie* 's holding that the interests of the RLA and the ICA are to be harmon-

ized to the fullest extent possible. TCU argues that *Lake Erie* provides a framework under which the employees' interest in arbitration under the RLA and the agreements must prevail. TCU further argues that the ICA does not give the ICC the authority to abrogate existing collective bargaining agreements when approving transactions. TCU also contends that if the analysis of the district court is upheld, the unionized employees will be deprived of property without compensation.

In response, MT claims that *Lake Erie* buttresses rather than undermines the district court's ruling that the ICC exemption strips the Special Board of jurisdiction. MT contends that its duty to arbitrate under the RLA was extinguished when MCRC was granted an exemption from ICC regulation several months before TCU declared its intent to arbitrate. While MT acknowledges that *Lake Erie* interpreted the RLA's mandatory bargaining provision rather than its arbitration provisions, MT argues that compelling policy reasons support extending *Lake Erie* to relieve railroads of their duty to comply with RLA arbitration obligations after an exemption from ICC regulation has been granted. MT further contends that even if *Lake Erie* is not dispositive, arbitration is not proper in the case because neither the WJPA nor the Stabilization Agreement apply to this case and the Special Board consequently has no contractual authority to hear the dispute.

### A. Relationship Between ICA and RLA

In order to properly consider what becomes of the RLA duty to arbitrate after an exemption from regulation has been granted pursuant to *Ex Parte 392*, it is necessary to briefly examine the statutory frameworks of the RLA and the ICA, the policy objectives of each, and how the statutes collide in the case before us. Congress has exercised its power under the commerce clause to regulate rail transportation for over a century and has granted the ICC plenary authority over rail transactions. *See Lake Erie*, 109 S.Ct. at 2596. For example, the ICC regulates rate and

tariff increases, *see* 49 U.S.C. §§ 10701–10766, the construction and operation of rail lines, *see id.* § 10901, and railroads' proposed abandonments of rail lines, *see id.* § 10903. The ICA also provides for ICC regulation of proposed acquisitions of rail lines by noncarriers under Title 49 U.S.C. § 10901 (Section 10901). *See Railway Labor Executives' Ass'n v. United States,* 791 F.2d 994, 1003 (2d Cir.1986) ("section 10901 governs single line acquisitions by noncarriers") (citing cases), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987). Under Section 10901(a)(3), a noncarrier may "acquire or operate an extended or additional railroad line only if the [ICC] finds that the present or future public convenience and necessity require or permit" the acquisition. Section 10901 sets forth the procedures for obtaining a certificate of public convenience and necessity, and Section 10901(e) permits the ICC to require the acquiring carrier "to provide a fair and equitable arrangement for the protection of the interests of railroad employees who may be affected" by the acquisition.

Because of increased competition, high costs, and extensive regulation, the railroad industry declined in the 1970s. In an effort to deregulate and revitalize the railroad industry, Congress enacted the Railroad Revitalization and Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 129, and the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (Staggers Act). The Staggers Act granted the ICC broad authority to exempt rail line acquisitions by noncarriers from the regulatory approval process in order to facilitate the acquisition and preservation of financially troubled rail lines. *See* 49 U.S.C. § 10505 (Section 10505). Pursuant to the authority conferred upon it by Section 10505, the ICC issued *Ex Parte 392,* which declared all noncarrier acquisitions presumptively exempt from Section 10901 regulation and provided that labor protection conditions would be imposed in individual cases only upon a showing of exceptional circumstances. *See Lake Erie,* 109 S.Ct. at 2591 n. 9.

In contrast to the ICA amendments and *Ex Parte 392,* which seek to expedite rail line transactions by decreasing regulation, the RLA expressly regulates certain management decisions and delays their implementation pending exhaustion of the bargaining and mediation procedures set forth in the statute. For example, 45 U.S.C. § 156 (Section 156) requires a carrier to give notice of and bargain over any proposed changes in rates of pay, rules, and working conditions, and maintain the status quo until the conclusion of any such bargaining. The RLA also requires employees and carriers to submit any dispute over the interpretation or application of collective bargaining agreements to mandatory arbitration. *See* 45 U.S.C. § 153 First (i) (Section 153 First (i)); *see also* 45 U.S.C. § 152 First.

This brief overview of the RLA and ICA demonstrates that the two acts "reflect two different sets of congressional policies and therefore make uncomfortable bedfellows." *Railway Labor Executives Ass'n v. City of Galveston,* 849 F.2d 145, 149 (5th Cir.1988) (*Galveston I*), *vacated and remanded on other grounds,* —— U.S. ——, 109 S.Ct. 3207, 106 L.Ed.2d 559 (1989), *on remand,* 883 F.2d 16 (5th Cir.1989) (per curiam), *opinion denying rehearing,* 897 F.2d 164 (5th Cir.1990) (*Galveston II*). On the one hand, the Staggers Act seeks to expedite the approval of rail transactions "so that efficient transactions are not derailed by regulatory red tape." *Galveston I,* 849 F.2d at 149 (citation omitted). On the other hand, the RLA requires railroads to maintain the status quo pending completion of the purposefully long and drawn out bargaining procedures set forth in the RLA. *Id.* In *Lake Erie,* to which we now turn, the Supreme Court attempted to accommodate and reconcile the competing objectives of the two statutes.

**B. The *Lake Erie* Decision**

The facts of *Lake Erie* can be briefly restated as follows. The Pittsburgh & Lake Erie Railroad Co. (P & LE) possessed trackage rights in New York and owned and operated 182 miles of rail line in Ohio and Pennsylvania. 109 S.Ct. at 2588. Be-

tween 1982 and 1987, P & LE lost $60 million dollars. After cost reductions and market expansion did not make the railroad profitable, P & LE decided to sell its assets for $70 million to P & LE Rail Co., Inc. (Railco), a newly formed subsidiary of Chicago West Pullman Transportation Corp. *Id.* Railco intended to continue operation of P & LE's lines, except that it would not assume P & LE's collective bargaining agreements and would hire only 250 of the 750 employees working for P & LE. *Id.* The unions objected to the sale, contending that the sale would affect the working conditions of P & LE's employees and was therefore subject to the mandatory notice, bargaining, and status quo provisions of 45 U.S.C. § 156 (Section 156). P & LE was willing to discuss the sale, but argued the sale was not subject to Section 156 because its mandatory notice, bargaining, and status quo provisions would intrude on the ICC's jurisdiction over the proposed sale and interfere with P & LE's prerogative to make the fundamental business decision of whether or not to leave the railroad business.[4] 109 S.Ct. at 2589.

In August 1987 the Railway Labor Executives' Association filed suit in federal district court seeking a declaratory judgment of P & LE's obligations under the RLA and an injunction prohibiting the sale pending P & LE's completion of its RLA bargaining obligations. *Id.* While the lawsuit was pending, Railco received an exemption from ICC regulation and the imposition of labor protective provisions pursuant to *Ex Parte 392. Id.* at 2591. The district court held that P & LE did not have a duty to bargain over its decision to sell, but was required to bargain over the effects of the sale on employees, and the status quo provision of Section 156 required that P & LE satisfy its bargaining obligations before the sale could be consummated despite the ICC's approval of the transaction. *Id.* at 2592. A divided court of appeals affirmed. *See* 845 F.2d 420 (3d Cir.1988).

On appeal, the Supreme Court held that P & LE was not required to comply with the mandatory notice, bargaining, and status quo provisions of Section 156 after the proposed sale of all its rail assets was exempted from ICC regulation under *Ex Parte 392. Id.,* 109 S.Ct. at 2596. The Supreme Court first examined whether P & LE's decision to sell its assets and leave the railroad business was prohibited by any *"agreements* affecting rates of pay, rules, or working conditions." 45 U.S.C. § 156 (emphasis added). The Court held that no express or implied agreement prohibited the sale of the rail line, sought to confer any rights on its employees in the event of a sale, or guaranteed that jobs would exist indefinitely. 109 S.Ct. at 2593. Thus, the sale and resulting loss of jobs would not change any agreement between the P & LE and its employees.

The Court next examined whether P & LE was required to postpone the sale and maintain the status quo in response to the Section 156 notices filed by the union irrespective of any express or implied agreement because the sale would affect the objective working conditions as defined in *Detroit v. Toledo Shore Line R.R. v. Transportation Union,* 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969) (*Shore Line* ). Under *Shore Line,* the Section 156 status quo provision applies to " 'those actual objective working conditions and practices, broadly conceived, which were in effect prior to the time the pending dispute arose.' " *Lake Erie,* 109 S.Ct. at 2593 (quoting *Shore Line,* 396 U.S. at 153, 90 S.Ct. at 301). The Court declined to apply *Shore Line* 's broad definition of Section 156's "working conditions" to P & LE's proposed sale. First, the Court believed that the extension of status quo protection to "objective" working conditions stretched Section 156's language "to its outer limits" and should be applied only with caution. 109 S.Ct. at 2594. Second, and more importantly, *Shore Line* did not involve a propos-

---

**4.** In an attempt to compel P & LE to bargain over the proposed sale, the unions filed their own Section 156 notices proposing changes in the existing agreements to ameliorate the impact of the sale upon the employees. P & LE continued to deny that it had any Section 156 obligations regarding the proposed sale. *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* —— U.S. ——, 109 S.Ct. 2584, 2589–90, 105 L.Ed.2d 415 (1989).

al by the railroad to terminate its business. Relying on *Textile Workers v. Darlington Manufacturing Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965) (*Darlington*), a case construing the duty to bargain under the National Labor Relations Act, the Court limited the duty to bargain as follows:

> [T]he decision to close down a business entirely is so much a management prerogative that only an unmistakable expression of congressional intent will suffice to require the employer to postpone a sale of its assets pending the fulfillment of any duty it may have to bargain over the subject matter of union notices such as were served in this case.

*Lake Erie*, 109 S.Ct. at 2595–96.

The *Lake Erie* Court proceeded to hold that P & LE was required neither to bargain about the decision to sell nor postpone the sale itself. P & LE was not totally relieved of its duty to bargain, but was only required to bargain about the effects of the sale until the date the exemption from ICC regulation became effective. *Id.* at 2597. Furthermore, P & LE was required to bargain only on those subjects which it, rather than the buyer, could satisfy. *Id.* The Court noted that its construction of the Section 156 mandatory notice, bargaining, and status quo provisions effectuated its duty to give meaning to both statutes, *id.* at 2596, and harmonized the two statutes "at least to a degree," *id.* at

2597. The Court also stressed that its construction of the RLA would effectuate Congress' objectives of deregulating the railroad industry and facilitating efficient transactions. *Id.* at 2597.

## C. Application of *Lake Erie* to MT's Duty to Arbitrate

■ In the present case, the district court held that MT was not required to arbitrate under the RLA because the ICC exemption superseded the jurisdiction of the Special Board.[5] Armed today with the benefit of *Lake Erie*, we hold that the district court was correct in ruling that MT was relieved of its duty to arbitrate, but not because the ICA supersedes or preempts the RLA. We believe that *Lake Erie* provides the appropriate framework for reconciling the competing objectives and statutory regimes of the ICA and the RLA when they conflict, and is dispositive of this appeal. Applying the analysis adopted in *Lake Erie*, we conclude that MT had an RLA duty to arbitrate pursuant to Section 153 First (i), but only about the effects of the lease transfer and not the decision of transfer itself. *See Lake Erie*, 109 S.Ct. at 2597. Moreover, MT had a duty to arbitrate about the effects of the lease only between January 21, 1987, and February 27, 1987, the date MCRC's *Ex Parte 392* exemption became effective.[6] *See id.* After MCRC's exemption became effective, TCU's duty to arbitrate was ex-

**5.** The district court relied in part on *Burlington Northern R.R. Co. v. United Transp. Union*, 848 F.2d 856 (8th Cir.), *cert. denied*, 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535 (1988), which held the RLA duty to bargain was superseded by an exemption granted pursuant to *Ex Parte 392*. At the same time the Supreme Court decided *Lake Erie*, it also vacated this court's decision in *Railway Labor Executives' Ass'n v. Chicago & N.W. Transp. Co.*, 848 F.2d 102 (8th Cir.1988) (*North Western I*) *vacated*, —— U.S. ——, 109 S.Ct. 3207, 106 L.Ed.2d 558 (1989), *on remand*, 890 F.2d 1024 (8th Cir.1989) (*North Western II*), *cert. denied*, —— U.S. ——, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990), which had also held that an exemption granted under *Ex Parte 392* superseded the RLA duty to bargain for reconsideration in light of *Lake Erie*. The *Lake Erie* Court was careful to caution that courts were not at liberty to choose between competing congressional enactments, 109 S.Ct. at 2596, and emphasized that

its decision rested on its construction of the RLA and not on the preemptive force of the ICA, *id.* at 2597. The Supreme Court presumably vacated and remanded *North Western I* in order to allow this Court to correct its holding that *Ex Parte 392* superseded the RLA.

**6.** MT agreed to sell its rail assets to MCRC on January 21, 1987. On February 1, MT abolished all 30 of its rail positions, including the 10 employees represented by TCU. MCRC thereafter filed a Notice of Application for Exemption with the ICC, notifying the ICC of its noncarrier status and requesting that no labor protection conditions be imposed on the transaction. MCRC's application was published in the Federal Register on February 20, 1987, and became effective February 27, 1987. When the ICC exempted the acquisition from regulation and approved the sale, MT ceased being a carrier within the meaning of the RLA.

tinguished. TCU lost its RLA right to arbitrate by its failure to request arbitration until it served written notice on the NRLC on November 4, 1987, over eight months after MCRC's exemption became effective.

While acknowledging that *Lake Erie* governs this appeal, TCU argues that *Lake Erie* supports its position that MT was required to arbitrate. According to TCU, *Lake Erie* requires a court to identify the competing RLA and ICA interests at stake and harmonize those interests to the extent possible. TCU contends that the ICA interests at stake are minimal because requiring MT to arbitrate would not interfere with the lease transfer because it has already been completed. In contrast, TCU argues that the employees' RLA and collective bargaining rights to arbitration would be protected by requiring post-sale arbitration. TCU argues that because the transfer has already been effectuated, the ICA interests have been vindicated and the employees' RLA arbitration rights should prevail.

We disagree with TCU's assertion that *Lake Erie* requires us to identify and balance the RLA and ICA interests on a case-by-case basis. The Supreme Court has already identified and weighed the respective RLA and ICA interests at stake and has articulated an analytical framework which reflects its accommodation of the competing interests. We are required to apply this framework, and are not free to undertake our own *ad hoc, de novo* balancing of the competing interests every time a case arises that involves a conflict between the ICA and RLA. The competing statutory interests are reconciled in this case by enforcing the employees' RLA rights until the *Ex Parte 392* exemption became effective, after which the ICA obligations were controlling.

TCU tries to escape application of *Lake Erie* by arguing that its reach is limited to disputes involving Section 156's mandatory notice, bargaining, and status quo provisions. We are unpersuaded that *Lake Erie*

can be so narrowly construed. While it is true that *Lake Erie* construed Section 156 of the RLA in relationship to the ICA, nothing in the opinion indicates that the analytical approach the Court adopted is confined to Section 156 cases or the particular facts before the Court. When the Supreme Court declines to limit the legal or factual reach of its decisions, "it is the principle [that] controls and not the specific facts [on] which the principle was decided." *Walker v. Georgia*, 417 F.2d 5, 8 (5th Cir. 1969). Because the *Lake Erie* decision was not explicitly limited, we are required to apply it to cases presenting similar facts and analogous legal issues.

We also note that it is particularly appropriate to apply *Lake Erie* to this case because the facts and policy considerations raised in the present case are almost identical to those presented in *Lake Erie*. The factual similarities between the two cases are striking. For example, both MT and P & LE were financially troubled carriers that transferred their assets to noncarriers, both of the acquiring noncarriers were granted exemptions pursuant to *Ex Parte 392*, no labor protection conditions were imposed on either transaction, and the unions in each case invoked the RLA to secure labor protection conditions from the carrier. The instant case also raises many of the same policy considerations present in *Lake Erie*. The *Lake Erie* Court was especially concerned with effectuating Congress' Staggers Act objectives of facilitatinq economically efficient rail transactions, saving short lines, and revitalizing the rail industry generally. *See* 109 S.Ct. at 2596–97. These concerns are also present in the case before us.

TCU argues that requiring MT to arbitrate will not hinder efficient rail transactions because the lease transfer has already been consummated. To begin with, TCU's claim that it did not attempt to challenge the transaction itself is not supported by the record.[7] Even assuming that TCU

---

7. In its submission to the Special Board, TCU requested that the Special Board order MT to maintain the status quo and refrain from completing the lease transfer. *See* MT's Affidavits and Exhibits in Support of its Motion for Summary Judgment Exh. 2, at 14–15. TCU's request for a status quo order belies its assertion that it did not try to prevent the transfer.

only requested post-sale arbitration, we do not take such a sanguine view of the effect that post-sale arbitration would have on rail transfers. We believe that sales of rail lines would be deterred just as much by requiring post-sale arbitration under Section 153 First (i) as they would by requiring pre-sale bargaining under Section 156. For example, potential sales might be rendered unprofitable if sellers were required to arbitrate with unions after selling their rail lines. A prudent seller faced with post-sale arbitration would probably increase its asking price by the estimated cost of any judgment likely to result from arbitration. If a seller could not obtain a price that covered the likely costs of post-sale arbitration, it might simply choose to abandon the line pursuant to 49 U.S.C. § 10903, thus resulting in a loss of service and further weakening the railroad industry. As with pre-sale bargaining, we believe that post-sale arbitration "would likely result in cancellation of [prospective] sale[s] and the frustration of Congress' intent through ICA amendments to deregulate the rail and air industries generally and more specifically to assist small rail lines with financial problems." *Lake Erie*, 109 S.Ct. at 2597.

In addition to hindering economically advantageous transactions, post-sale arbitration could effectively negate a carrier's decision to leave the railroad business altogether. In *Lake Erie*, the Supreme Court refused to construe Section 156 to require P & LE to bargain over and postpone its decision to sell its assets and leave the railroad business. *Id.* at 2595–96. In contrast, when a carrier sells only some of its assets and remains in the railroad business, requiring post-sale effects bargaining does not intrude upon the carrier's prerogative to leave the railroad business. In *North Western II*, we discussed the importance of a carrier's decision to leave the railroad business:

> In [*Lake Erie*], the Supreme Court held that the obligation to bargain over effects existed only until the date for closing the sale arrived, which, of course, would not occur in this case until the *[E]x [P]arte 392* exemption became effective and the transfer occurred. We are convinced that the Supreme Court placed a time limitation on the obligation to bargain because after that date, the selling railroad would have no assets and no employees. Here, the selling railroad will retain the major portion of its assets and will continue to employ persons who are members of the labor organizations that are parties to this case. Thus C & NW can bargain about the effects of the sale without delaying or upsetting the sale.

*North Western II*, 890 F.2d at 1025–26 (citation omitted). Because MT transferred all of its assets, discharged all of its rail employees, and left the railroad business entirely, the present case is controlled by *Lake Erie* rather than *North Western II*. We refuse to construe the RLA and the collective bargaining agreements to require post-sale arbitration because it would interfere with MT's " 'absolute right to terminate [its] entire business for any reason [it] pleases.' " *Lake Erie*, 109 S.Ct. at 2595 (quoting *Darlington*, 380 U.S. at 268, 85 S.Ct. at 998). We therefore conclude that *Lake Erie* controls this case and MT's duty to arbitrate terminated as of February 27, 1987.

### D. Alleged Abrogation of Collective Bargaining Agreements

The last argument we need to address is TCU's contention that the present case is different from *Lake Erie* because two collective bargaining agreements secured arbitration rights for the employees, and the district court's decision effectively permitted the ICC to exceed its authority by abrogating existing collective bargaining agreements. In order to address this contention, we must first determine whether MT had a contractual duty to arbitrate the lease transfer. In *AT & T Technologies v. Communication Workers*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (*AT & T*), the Supreme Court identified several factors that should be considered in determining whether a duty to arbitrate exists. First, arbitration is a matter of contract and a litigant cannot be required to submit any dispute to arbitration which he or she has not agreed to submit. *Id.* 475 U.S. at

648, 106 S.Ct. at 1418. Second, whether there is a duty to arbitrate a given dispute is a question for the court and not the arbitrator. *Id.* at 649, 106 S.Ct. at 1418. Third, in deciding whether the parties have agreed to submit a dispute to arbitration, the court is not to rule on the potential merits of the underlying claim. *Id.* Finally, where there is a contractual arbitration clause, there is a presumption of arbitrability, meaning that arbitration "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 650, 106 S.Ct. at 1419 (citation omitted).

■ With these principles in mind, we examine whether MT had a contractual duty to arbitrate under the WJPA or Stabilization Agreement. Under Section 1 of the WJPA, the duty to arbitrate arises only when a coordination has occurred. Joint Appendix (J.A.) at 54. Section 2(a) defines a coordination as a "joint action by two or more carriers whereby they unify, consolidate, merge, or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities." *Id.* Section 13 provides for "arbitration in the event that any dispute or controversy arises ... in connection with a particular coordination." The rights guaranteed in the Stabilization Agreement arise when carriers make "technological, operational, and organizational changes." J.A. at 67. Under this agreement, carriers are permitted to make such changes and to transfer work and employees in exchange for labor protections for displaced workers. Article VII of the Stabilization Agreement provides for arbitration of disputes involving the interpretation and application of the agreement. J.A. at 72.

MT had no duty to arbitrate under the WJPA because no *coordination* between two or more *carriers* has occurred. There has been no joint action by two or more carriers by way of unification, consolidation, merger, or pooling of separate railroad facilities in this case." *See* J.A. at 54. MT has not joined with MCRC to operate

terminal rail service in the Minneapolis–St. Paul area. MT has leased all its assets, terminated its rail employees, and gone out of the railroad business altogether. In addition to there being no joinder or merger of operations between MT and MCRC, there were not two or more carriers as required for a coordination. Section 2(b) of the WJPA defines carrier by reference to the ICA. However, the ICC determined that MCRC was not a carrier at the time of the lease transfer and accordingly granted it an *Ex Parte 392* exemption, which is available only for acquisitions by noncarriers.

Similarly, MT had no duty to arbitrate under the Stabilization Agreement because its decision to lease its assets and leave the railroad business entirely does not constitute a technological, operational, or organizational change within the meaning of the agreement. In *Brotherhood of Railway, Airline & Steamship Clerks v. Kansas City Ry. Co.*, 587 F.2d 903 (8th Cir. 1978) (*BRAC*), *cert. denied*, 441 U.S. 907, 99 S.Ct. 1997, 60 L.Ed.2d 376 (1979), we affirmed the decision of Special Board of Adjustment No. 605 that the railroad's decision to eliminate its mail and baggage handling operations altogether was not covered by the Stabilization Agreement. We cited the reasoning of the Special Board with approval:

> [T]he February 7, 1965 Stabilization Agreement was intended to provide protection to employees in the event of a decline in the Carrier's business. Said Agreement was not intended, in our opinion, to accord protection to employees when the work previously performed by them disappears entirely. The [Stabilization] Agreement simply did not address the question of what was to happen when there was a complete cessation of the Company's business. And merely because the Terminal Company was still engaged in activities separate and apart from mail handling, this nonetheless does not alter the fact that the mail handling work previously performed by the Claimants was completely abolished....

*Id.* at 907. Unlike the railroad in *BRAC*, MT did not even continue operations in the

railroad business. MT left the railroad business altogether. MT had no duty to arbitrate under the Stabilization Agreement because that agreement does not apply when a railroad ceases doing business.

*Brotherhood of Railway Carmen v. ICC,* 880 F.2d 562 (D.C.Cir.1989) (*Carmen*), *cert. granted sub nom. Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n,* — U.S. —, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990), and *Association of Flight Attendants v. Delta Air Lines, Inc.,* 879 F.2d 906 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990) (*AFA*), the cases cited by TCU, do not persuade us that the ICC has abrogated collective bargaining agreements and exceeded its authority in this instance. In *Carmen,* the D.C. Circuit held that the ICA did not authorize the ICC to override explicit provisions of a collective bargaining agreement in approving a carrier's merger with other carriers. 880 F.2d at 567–68. In *AFA,* the D.C. Circuit held that the union certification procedures of the National Mediation Board (NMB) did not override a bargained-for successorship clause requiring a successor carrier to recognize the union. 879 F.2d at 916–17. While acknowledging that the NMB had exclusive jurisdiction over union representation disputes, the court held that the union could submit its breach of contract damages action for breach of the successorship clause to arbitration as provided for by the collective bargaining agreement. *Id.* at 917.

*Carmen* and *AFA* are clearly distinguishable from the present case. Most importantly, unlike the present case, explicit provision of the collective bargaining agreements were clearly violated in *Carmen* and *AFA.* In *Carmen,* the carrier explicitly agreed to employ "each covered employee for the remainder of his working life," 880 F.2d at 563, and breached this provision when it merged with other carriers, transferred work, and discharged covered employees. Likewise, the successorship clause in *AFA* explicitly required Western Airlines to bind any successor to the collective bargaining agreement, and

Western breached this clause by merging with Delta without properly binding Delta. *See* 879 F.2d at 907. In distinction, neither the WJPA nor the Stabilization Agreement purport to guarantee covered employee jobs for life. Nor do the agreements protect employees if a carrier decides to go out of business. As we have demonstrated above, the WJPA was not violated because there was no coordination between two or more carriers, and the Stabilization Agreement was not violated because MT's decision to lease its assets, discharge its employees, and leave the railroad business was not a technological, operational, or organizational change. *Carmen* and *AFA* are distinguishable for a second reason. In both of these cases, the carriers merged and continued in their respective businesses after the mergers. In the present case, MT left the railroad business entirely, a fact the *Lake Erie* requires us to accord great significance. *See* 109 S.Ct. at 2594–95. In sum, *Carmen* and *AFA* are inapposite because, as was the case in *Lake Erie,* MT had no express or implied agreement with its employees that it "would not go out of business, would not sell its assets, or if it did, would protect its employees from the adverse effects of such action." *Id.* 109 S.Ct. at 2573.

The WJPA duty to arbitrate arises only when there has been a coordination between two or more carriers. The Stabilization Agreement duty to arbitrate arises only when there has been a technological, operational, or organizational change. Because both agreements have arbitration clauses, there is a presumption of arbitrability. *AT & T,* 475 U.S. at 650, 106 S.Ct. at 1419. However, this presumption is clearly overcome in this case because we have determined "with positive assurance that the arbitration clause[s are] not susceptible of an interpretation that covers the asserted dispute." *Id.* Because MT had no duty to arbitrate under either the WJPA or the Stabilization Agreement, the ICC did not abrogate or otherwise violate any existing collective bargaining agreement when it granted MCRC an exemption from ICC

regulation pursuant to *Ex Parte 392*.[8] Having decided that the ICC exemption did not abrogate any existing contract right possessed by the employees, we need not reach TCU's claim that the ICC exemption effectuated a taking of property without just compensation in violation of the fifth amendment.

### CONCLUSION

To summarize, we hold that MT's RLA duty to arbitrate was extinguished on February 27, 1987, the date the *Ex Parte 392* exemption became effective. The district court was therefore correct in holding that the Special Board had no jurisdiction to arbitrate the dispute, but not because the ICA superseded the RLA. We further hold that MT had no contractual duty to arbitrate the lease transfer, and therefore the ICC did not exceed its authority in granting the exemption, and no fifth amendment claim was raised by the exemption. Accordingly, the order of the district court is

Affirmed.

---

8. Because the lease transfer did not violate or abrogate the WJPA or the Stabilization Agreement in any way, we express no opinion on whether the ICC exceeds its authority under the ICA when it grants an *Ex Parte 392* exemption that effectively abrogates an existing collective bargaining agreement. Perhaps the effectuation of Congress' Staggers Act objectives of deregulating and strengthening the rail industry would constitute "important public polic[ies]" warranting the abrogation of private agreements, *see Association of Flight Attendants v. Delta Airlines*, 879 F.2d 906, 916 (D.C.Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990), but we need not decide this question today. However, it is important to recognize that railroads owning approximately 85% of the railroad mileage in the country as well as 20 of the 21 national railroad labor unions were parties to the WJPA. *See New York Dock Ry. v. United States*, 609 F.2d 83, 86 (2d Cir.1979). If the WJPA duty to arbitrate was found to survive the issuance of an *Ex Parte 392* exemption, many efficient transactions might not be consummated, thereby thwarting the objectives of the Staggers Act. We also note that the Supreme Court has granted certiorari in *Brotherhood of Railway Carmen v. ICC*, 880 F.2d 562 (D.C.Cir.1989), *cert. granted sub nom. Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, —— U.S. ——, 110 S.Ct. 1522, 108 L.Ed.2d 762 (1990), so it is unclear whether the D.C. Circuit's holding that the ICC has no authority to abrogate existing collective bargaining agreements is a correct statement of existing law.