**STATE OF MINNESOTA BY BURLINGTON NORTHERN RAILROAD COMPANY, a Delaware corporation; and Burlington Northern Railroad Company, a Delaware corporation, Plaintiffs,**

v.

**BIG STONE–GRANT INDUSTRIAL DEVELOPMENT AND TRANSPORTATION, L.L.C. a South Dakota limited liability corporation, Defendant.**

No. 3–95–239.

United States District Court,
D. Minnesota,
Third Division.

Feb. 14, 1997.

Timothy Robert Thornton, Michael J. Tostengard, Briggs & Morgan, Minneapolis, MN, for Plaintiffs.

Joseph T. Dixon, Jr., Scott A. Neilson, Henson & Efron, Minneapolis, MN, Nicholas J. DiMichael, Thomas W. Wilcox, Donelan, Cleary, Wood & Maser, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

DAVIS, District Judge.

This case arises out of the proposed construction of a new line of railroad track that would connect two "spurs" of the Plaintiff Burlington Northern Railroad Company's ("BN") existing tracks. Defendant Big Stone–Grant Industrial Development and Transportation, L.L.C. ("Big Stone") pro-posed to build the new track in order to serve new industries that would locate in a new industrial park, which would be located in South Dakota. BN asserts that the construction of the new track would cause a rival railroad company, the Twin Cities and Western Railroad Company ("TCW"), to breach its contracts with BN. BN brought this declaratory judgment action alleging intentional interference with contractual relations, and a claim under the Minnesota Environmental Rights Act, Minn.Stat. § 116B.01–.13 ("MERA"). BN has since withdrawn its MERA claim, thus the only matter before the Court is the tortious interference with contract claim. For the reasons discussed herein, the Court will grant BN's motion for summary judgment and deny Big Stone's motion for summary judgment.

*Factual Background*

BN owns a railroad line extending from Appleton, Minnesota to Milbank, South Dakota. The line was originally built by the Chicago, Milwaukee and St. Paul Railway Company ("Milwaukee") which extended to the Pacific Northwest. Milwaukee operated on this railroad line until 1980 when it ended operations from the Minnesota border at Ortonville to Seattle, Washington. This portion of the line became part of the bankruptcy estate of Milwaukee. BN purchased the South Dakota segment of the line, which runs from Milbank, South Dakota to Ortonville, Minnesota. In 1985, the Soo Line Railroad ("Soo Line") purchased the Minnesota segment of the line, which runs from Ortonville to Appleton, Minnesota. BN purchased this segment in 1992.

1. Trackage Agreements

In 1982, BN granted Milwaukee "overhead trackage" rights for the South Dakota segment of BN's line ("1982 Agreement"). Milwaukee's successor, Soo Line, subsequently assigned these overhead trackage rights to TCW. The 1982 Agreement allows TCW to use the line, but does not allow TCW to "originate or terminate any freight upon any segment of the joint line, or serve any industry, team or house tracks now connected to or which may in the future be connected to the joint line." 1982 Agreement, Section 2.1.

The Ottertail Power site is currently served by BN, and is located on and connected to the South Dakota segment by a spur which is owned by the power plant.

In 1991, TCW was granted local trackage rights to the Minnesota segment by Soo.Line ("1991 Agreement"). BN became Soo Line's successor to the 1991 Agreement when it purchased the Minnesota segment from Soo Line. The 1991 Agreement grants TCW the right to the non-exclusive use of the "joint line" for operations of its trains including "the right to serve or switch any industries, now located upon the Joint Line, team or house tracks now connected to or which may in the future be connected to the Joint Line." 1991 Agreement, Section 2.2.

### 2. Proposed New Railroad Line

In January 1995, Big Stone petitioned the Interstate Commerce Commission ("ICC") for approval for the construction of a railroad line. Big Stone seeks to extend a line from what is referred to as the Cannery Spur. The Cannery Spur extends from the BN's main line on the Minnesota segment just east of the Minnesota/South Dakota border. Big Stone seeks to extend the line from the Cannery Spur, along an abandoned portion of the old Milwaukee line, across the South Dakota segment of BN's line, to join the Ottertail Power Spur north of the South Dakota segment.

The purpose of the new line is to allow TCW to provide rail service to industries that may locate in an industrial park to be formed by Big Stone. This industrial park is to be located near the Ottertail Power Plant. The new line would also allow TCW to serve the Ottertail Power Plant.

In response to Big Stone's petition to the ICC, BN commenced this declaratory judgment action. BN seeks a declaration from this Court that Big Stone would tortiously interfere with BN's trackage rights agreements with TCW by inducing TCW to provide service to an industry located on or connected to the South Dakota segment in violation of the 1982 Agreement, and by inducing TCW to serve an industry not located on the Minnesota segment, in violation of the 1991 Agreement. Both parties have moved this Court for summary judgment, seeking an interpretation of both the 1982 and 1991 Agreements.

### Standard for Summary Judgment

Summary judgment is appropriate if there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Unigroup, Inc. v. O'Rourke Storage & Transfer Co.,* 980 F.2d 1217, 1219–20 (8th Cir.1992). As the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554.

■ Under Minnesota law, the elements of a tortious interference with contract claim are 1) the existence of a contract; 2) the alleged wrongdoer's knowledge of the contract; 3) the intentional procurement of the contract's breach; 4) without justification; and 5) damages. *Lipka v. Minnesota School Employee's Ass'n,* 537 N.W.2d 624, 631 (Minn.Ct.App.1995) *aff'd* 550 N.W.2d 618 (Minn.1996). BN seeks a declaratory judgment that Big Stone would tortiously interfere with BN's Agreements with TCW if the new line were constructed and TCW would be allowed to serve industries on the new line. Big Stone concedes the first two elements. The parties agree that the issues for this Court to determine are whether the 1982 and 1991 Agreements would be breached if the new line were constructed and TCW were allowed to serve industries on the new line.

### Standard for Contract Interpretation

In *Republic Nat. Life Ins. v. Lorraine Realty,* the Minnesota Supreme Court summarized Minnesota law concerning contract interpretation.

Whether there is ambiguity in a contract is a legal determination in the first instance ... Ambiguity exists if it is susceptible to more than one construction ... When examining instruments, courts are to ascertain and give effect to the intent of the

parties if that can be done consistently with established legal principles ... Intent is "ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole" ... Where language is found to be ambiguous, courts may resort to extrinsic evidence.

*Id,* 279 N.W.2d 349, 354 (Minn.1979) (internal citations omitted). Both parties assert that the language of the 1982 and the 1991 Agreement is unambiguous, thus interpretation of the Agreements is a matter of law for the Court.

### 1. 1991 Agreement

■ BN asserts that TCW would breach the local trackage rights agreement if it served the Ottertail Power Plant or the Big Stone industrial park over the proposed new line. Big Stone counters that the language of Article I and II of the 1991 Agreement expressly permits TCW to serve industries that locate upon the Joint Line in the future. Big Stone specifically relies on the following provisions to support its position.

Article 2.1 of the 1991 Agreement provides:

Subject to the terms and conditions herein contained, Owner grants to User the non-exclusive right to use the Joint Line for the operation of its trains, locomotives, cabooses and cars, including track inspection cars and work or wreck equipment, in its account over the Joint Line in common with Owner and such other railroad company or companies as Owner may hereafter at any time in the future admit to the joint use of all or any part of the Joint Line, including, without limitation, the right to serve or switch any industries, now located upon the Joint Line, team or house tracks now connected to or which may in the future be connected to the Joint Line.

Article 2.2 provides:

User shall have the right to participate in switching and serving industries in the future that locate on the Joint Line, provided User pays to owner one-half of the cost of the construction of such industry track (including all turnouts, switch ties and other track material) required to provide service to the industry ...

Joint Line is defined in the 1991 Agreement as follows:

The Joint Line consists of (i) that portion of Owner's main line railroad tracks between point "A" (Milepost 600.70 at Ortonville, Minnesota) and Point "B" (Milepost 578.93 at Appleton, Minnesota) ... and (ii) all sidings, yard tracks, and industry tracks now existent or hereafter that may be constructed along the trackage described in this Subarticle 1.1, which sidings shall be used by User only for the purposes set forth in Article II, and (iii) right-of-way for the aforesaid tracks, signals, interlocking devices and plants, telegraph and telephone lines, and other appurtances necessary to the use of the aforesaid tracks by the Parties thereto.

Big Stone argues that the proposed new line is merely an extension of the Cannery Spur, which is an industry track. Thus the new line is an industry track. Big Stone asserts that the definition of Joint Line contemplates that additional industry track will be constructed along and connected to the Joint Line, and would thus fall within the definition of the Joint Line.

BN responds that the proposed new line is not an industry track because 1) ICC approval is not necessary for the construction of an industry track yet Big Stone petitioned the ICC for approval; and 2) the proposed new line does not fall within the definition of industry track as defined in the case law.

The Interstate Commerce Act, 49 U.S.C. § 10901(a) provides a rail carrier may construct a new railroad line or an extension thereof, only with approval of the ICC. The ICC does not have authority, however, over the construction or operation of spur, industrial, team, switching or side tracks. 49 U.S.C. § 10906. It is undisputed that Big Stone petitioned the ICC for approval of the new line in this case, and that the ICC conditionally exempted the construction from the prior approval requirements of 49 U.S.C.

§ 10901, subject to an environmental assessment. This fact establishes the ICC's belief that it had authority over the construction of the new line. Irregardless of the ICC's understanding of the nature of the proposed new line, the evidence before the Court clearly establishes that the new line does not fall within the recognized definition of industrial track.

The determination of whether a railroad track is an industry track or a railroad line is a mixed question of law and fact to be determined by the courts. *See, Illinois Commerce Commission v. United States,* 779 F.2d 1270, 1271 (7th Cir.1985) (internal citations omitted). Courts have looked at the use of the track to determine whether the track is a railroad line or industry track. *Id.,* at 1272. In *Texas & Pacific Railway v. Gulf, Colorado & Santa Fe Railway,* 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926) the United States Supreme Court held "if the purpose and effect of the new trackage is to extend substantially the line of the carrier into new territory, the proposed trackage constitutes an extension of the railroad within the meaning of [section 10901], although the line be short and although the character of the services contemplated be that commonly rendered ... by means of spurs or industrial tracks" the track will be considered a railroad line. *Id.,* at 278, 46 S.Ct. at 266. Where a line of railroad invades territory served by another carrier, and diverts business from that carrier, the railroad will be considered a railroad line. *Id.,* at 266, 46 S.Ct. at 266. On the other hand, track segments that are incidental to, and not required for, a railroad's service between points of shipment and delivery are considered spurs or industrial tracks. *Nicholson v. Interstate Commerce Commission,* 711 F.2d 364, 368, 229 U.S.App.D.C. 86, 90 (D.C.Cir. 1983) *cert. denied,* 464 U.S. 1056, 104 S.Ct. 739, 79 L.Ed.2d 197 (1984). Or a track that is stub-ended and used exclusively to serve one shipper, has been judicially defined to be a spur. *Illinois Commerce Commission,* 779 F.2d at 1272.

In *New Orleans Terminal Company v. Spencer,* 366 F.2d 160 (5th Cir.1966) *cert. denied,* 386 U.S. 942, 87 S.Ct. 974, 17 L.Ed.2d 873 (1967), the Fifth Circuit held:

> If there are traffic movements which are part of the actual transportation haul from shipper to consignee, then the trackage over which the movement takes place is a 'line of railroad, or extension thereof,' ... If, however, the trackage is used in the loading, reloading, storage and switching of cars incidental to the receipt of shipments by the carrier or their delivery to the consignee, then such trackage is 'spur, industrial, team, switching or side tracks' and as such, not under Commission jurisdiction.

*Id.,* at 165–166.

The proposed new line at issue in this case is not an industrial track. Its purpose is not for loading, reloading, storage or switching. Rather, it will extend the line of TCW into new territory and allow TCW to serve new industries. It will also invade territory served by BN and will divert business from BN. As the proposed new line is not an industry track, but is rather a new line of railroad, the 1991 Agreement would not permit TCW to serve industries using the new line.

Even if the Court were to find that the construction of the proposed new line does not breach the 1991 Agreement, the Court finds that the terms of the 1982 Agreement nonetheless control the outcome of this case because the purpose of the new line is to serve industries now connected to or in the future will be connected to the South Dakota segment of BN's line.

2. 1982 Agreement

Under the 1982 Agreement, TCW has overhead trackage rights. Specifically, Section 2.1 provides TCW "the nonexclusive right to use the Joint Line for the operation of its trains, locomotives, cabooses and cars ... it being understood that [TCW's] rights are limited to traffic originating or terminating between Wilmot and Sisseton and [TCW] may only interchange traffic originating or terminating between Wilmot and Sisseton at

Milbank ... and [TCW] shall not otherwise have the right to:

\* \* \*

(b) originate or terminate any freight upon any portion of the Joint Line or serve any Industry, team or house tracks now connected to or which may in the future be connected to the Joint Line; ...

The proposed new line crosses the South Dakota segment of BN's line and would join the Ottertail Power Spur north of the South Dakota segment. The Big Stone Industrial Park is to be located in the vicinity of the Ottertail Power Plant, and would be served through the Ottertail Power Spur. BN asserts that it currently is the exclusive carrier to the Ottertail Power Plant, and that the Plant is served through a spur that it is connected to the Joint Line. Clearly, Section 2.1(b) would prohibit TCW from serving the Ottertail Power Plant as it is an industry "connected ... to the Joint Line." Furthermore, the Big Stone Industrial Park would also be connected to the Joint Line from the Ottertail Power Spur. Therefore, TCW would be precluded from serving any industry that would locate in the Big Stone Industrial Park.

Big Stone asserts that the 1982 Agreement would only preclude it from serving the Ottertail Power Plant or industries to locate in the Big Stone Industrial Park if it used the South Dakota segment of BN's main line to do so. Section 2.1(b), however, does not condition its applicability to when TCW is using the South Dakota segment of BN's line. The language is unequivocal: in exchange for the right to use BN's line, TCW gave up the right to serve industries located on or connected to the South Dakota segment. Accordingly, the 1982 Agreement precludes TCW from serving any industry which is located on or connected to the South Dakota segment of BN's line. The fact that the Ottertail Power Plant owns the spur is irrelevant. The spur is connected to the South Dakota segment of BN's line, therefore it is covered by the 1982 Agreement.

■ Big Stone asserts that even if the Court determines BN's interpretation of the contracts is correct, BN is not entitled to summary judgment on the tortious interference with contract claim. Big Stone contends that the issue of whether Big Stone sought to intentionally induce TCW to breach the 1982 or 1991 Agreements is a factual issue that is not currently before the Court. Further, Big Stone argues that it had a good faith belief that the construction of the new line was permissible, as TCW obtained a legal opinion that the new line would not breach the 1982 or the 1991 Agreements. Thus, BN cannot establish that Big Stone acted improperly under the law with respect to BN's contracts with TCW.

BN responds that under *Restatement* (Second) of Torts § 766, Comment i at 11 (1979), contract interference is not excused by the tort feasor's reliance upon a mistaken legal belief, or upon representations of one of the parties to the contract.

To be subject to liability under the rules stated in this section, the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he had no knowledge of the contract. But it is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract. If he knows those facts, he is subject to liability even though he is mistaken as to their legal significance and beliefs that the agreement is not legally binding or has a different legal effect from what is judicially held to have.

*Id.*

In *Don King Prods., Inc. v. Douglas,* 742 F.Supp. 741, 775 (S.D.N.Y.1990), the court, citing to the *Restatement* section above, noted that the gist of the tortious interference with contract action is "not the intent to injure, but to interfere without justification with plaintiff's contractual rights with knowledge thereof." The court also stated that it is not necessary to know each term of the contract, that knowledge of the existence of a contract is sufficient to imply malice. *Id.*

The court also rejected the argument that a tort-feasor's belief that a contract might be invalid, and that it conditioned its rights contingent upon such a determination, did not excuse liability for interference with contract. *Id.*, at 777. The court is not to look at the state of mind of the tort-feasor, but is to look to the actual, legal interest of the contract interfered with. *See also, Bennett v. Storz Broadcasting Co.*, 270 Minn. 525, 134 N.W.2d 892 (1965) (An intentional interference with another's contractual rights, without lawful justification, is malicious in law even if the interference stems from good motives and without express malice.)

Big Stone also asserts that even if the Court finds it interfered with the Agreements between TCW and BN, it was justified in doing so, citing to *Bennett, supra. Bennett* stands for the proposition that one may interfere with another's contractual rights, where the former's interest is equal to or superior to that of the latter and the interference is made with "the honest purpose of fairly bettering one's own business, trade, or employment, and not for the primary object of destroying another's employment or business." *Id.*, 270 Minn. at 532, 134 N.W.2d at 897. The court went on to determine whether the contract upon which the defendant relied, created an interest which the law would protect. *Id.*, 270 Minn. at 533, 134 N.W.2d at 898.

In this case, Big Stone does not point to any interest, equal or superior to BN's interests provided in the 1982 and 1991 Agreements, that would justify the interference. *Bennett* suggests that an equal or superior right that may justify interfering with another's contractual rights would be contained in a contract entered into by Big Stone. Big Stone does not identify any contract that grants it a right equal or superior to BN's rights under the trackage agreements with TCW.

Applying the above standards to this case, the Court finds that BN is entitled to judgment as a matter of law. If Big Stone were to construct the new line and induce TCW to serve industries on such line, TCW would breach both the 1982 and the 1991 Agreement. Such action by Big Stone would constitute tortious interference with the contractual rights of BN in the trackage rights agreements with TCW.

IT IS HEREBY ORDERED:

1. That BN's Motion for Summary Judgment is GRANTED.

2. That Big Stone's Motion for Summary Judgment is DENIED.

3. This Court declares, pursuant to Minn. Stat. § 550.01, that if Big Stone constructs the proposed new railroad line at issue in this litigation and induces TCW to deliver freight over the proposed new line to any shippers located at Big Stone's site near Big Stone City, South Dakota, including Ottertail Power Company, Big Stone will have tortiously interfered with BN's agreements with the TCW; and

4. This Court shall enter any subsequent Orders necessary in accordance with the above declaration in order to protect the rights of the parties.

LET JUDGMENT BE ENTERED ACCORDINGLY.